No. 25-20437

---

United States Court of Appeals for the Fifth Circuit

---

CONSTANCE JOY II, L.L.C., A DELAWARE LIMITED LIABILITY COMPANY,

*Plaintiff-Appellant/Cross-Appellee*

*v.*

STEWART & STEVENSON FDDA, L.L.C., A DELAWARE LIMITED LIABILITY COMPANY, DOING BUSINESS AS FLORIDA DETROIT DIESEL-ALLISON,

*Defendant-Appellee/Cross-Appellant*

---

Appeal from the United States District Court
for the Southern District of Texas
No. 4:20-cv-02967 (Hon. Drew B. Tipton)

---

# PRINCIPAL BRIEF OF APPELLANT/CROSS-APPELLEE CONSTANCE JOY II, L.L.C.

---

John B. Shely*
Brian C. Pidcock
Cameron Pope
Chaim Mindick
HICKS THOMAS LLP
700 Louisiana Street, Ste. 2300
Houston, Texas 77002
(713) 547-9140
*jshely@hicks-thomas.com*

*Counsel of Record

*Counsel for Plaintiff-Appellant/Cross-Appellee Constance Joy II, L.L.C.*

# CERTIFICATE OF INTERESTED PERSONS

No. 25-20437

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. **Plaintiff-Appellant/Cross-Appellee**: Constance Joy II, L.L.C.

   Barry Skolnick is the sole member of Constance Joy II, L.L.C.

   John B. Shely*
   Brian C. Pidcock
   Cameron Pope
   Chaim Mindick
   HICKS THOMAS LLP
   700 Louisiana St., Ste. 2300
   Houston, Texas 77002
   (713) 547-9140
   *jshely@hicks-thomas.com*
   *bpidcock@hicks-thomas.com*
   *cpope@hicks-thomas.com*
   *kmindick@hicks-thomas.com*

2. **Defendant-Appellee/Cross-Appellant**: Stewart & Stevenson FDDA, L.L.C.

   Kenneth G. Engerrand*
   BROWN SIMS P.C.
   1990 Post Oak Blvd., Ste. 1800
   Houston, Texas 77056
   (713) 351-6270
   *kengerrand@brownsims.com*

George M. Chalos
CHALOS & CO, P.C.
7210 Tickner Street
Houston, Texas 77005
(713) 574-9582
*gmc@chalos.com*

s/ *John B. Shely*
John B. Shely

March 13, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant/Cross-Appellee Constance Joy II, L.L.C. ("CJ II") respectfully submits that oral argument is necessary and appropriate because this appeal involves three significant, underdeveloped areas of federal maritime law in the Fifth Circuit.

First, CJ II argues that a maritime contract that effectively exculpates a party for gross negligence, like that at issue here, is void as a matter of law. As Judge Elrod recognized in a recent concurrence, there is "an unsettled question in [the Fifth Circuit's] law of maritime contract pertaining to exemptions from liability for acts of gross negligence." *ENSCO Offshore, L.L.C. v. Cantium, L.L.C.*, No. 24-30508, 2025 WL 3552768, at *3 (5th Cir. Dec. 11, 2025) (per curiam) (Elrod, J., concurring).

Second, this appeal addresses the question of whether an agent's apparent authority to enter a maritime contract includes the ability to agree to one-sided terms—in this case, to unusual terms in the form contract of Defendant-Appellee/Cross-Appellant Stewart & Stevenson FDDA, L.L.C. ("FDDA") that result in FDDA paying no price for its negligence other than merely refunding the money CJ II paid for FDDA's negligent work. There is little case law on this issue, and the district court's judgment will ripple throughout the maritime industry.

Third, as Judge Elrod stated in her concurrence, the Fifth Circuit "ha[s] not always been clear" as to when and to what extent issues should be analyzed under maritime or state law. *Id.* at *4 n.4. Here, CJ II contends that maritime law determines the *enforceability* of a maritime contract with a Texas choice of law provision, but the contract must be *interpreted* under Texas law, including Texas' express negligence rule. Thus, the Court is presented with the opportunity to clarify when and how state law applies in such scenarios.

Additionally, oral argument may assist the panel in understanding the technical aspects of this case and the fulsome record, which includes extensive motions practice leading to a multi-day bench trial.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................i

STATEMENT REGARDING ORAL ARGUMENT ..........................................iii

JURISDICTIONAL STATEMENT ...................................................................xvi

STATEMENT OF THE ISSUES .....................................................................xvii

INTRODUCTION ..............................................................................................1

STATEMENT OF THE CASE ...........................................................................2

A. CJ II buys the Yacht ..........................................................................2

B. Staffing the Yacht and preparing for charter .......................................2

C. Engine troubles ....................................................................................3

D. The incident ........................................................................................4

E. Procedural history ..............................................................................4

SUMMARY OF ARGUMENT ............................................................................5

STANDARD OF REVIEW ................................................................................6

ARGUMENT ......................................................................................................7

I. The district court erred in holding that Clause 14 limits CJ II's recovery ..........................................................................................................7

A. Maritime contract law .........................................................................8

B. Clause 14 is unenforceable because it exculpates FDDA for gross negligence ..............................................................................................9

1. Clause 14 broadly allows FDDA to escape liability for grossly negligent conduct ..................................................10

2. Red-letter clauses that limit recovery for gross negligence are unenforceable in the Fifth Circuit ....................12

3. Clause 14 is invalid even if only ordinary negligence is at issue ........ 14

C. Clause 14 is unenforceable for reasons beyond its exculpation for gross negligence ........ 18

1. Clause 14 is unenforceable because it provides no meaningful deterrent to negligence ........ 18

a. Ship repair contracts may not include red-letter clauses that fail to provide a deterrent to negligence ........ 20

b. In limiting CJ II to nothing more than a refund, Clause 14 is inadequate ........ 22

c. The district court's reasoning rests on an inapposite Florida district court opinion ........ 25

2. Clause 14 is unenforceable because CJ II did not have equal bargaining power ........ 27

a. As the engines' exclusive warranty servicer in South Florida, FDDA had superior power ........ 28

b. FDDA exerted its superior power ........ 30

3. Clause 14 is unenforceable because it does not clearly express FDDA's intent to disclaim negligence liability ........ 31

II. The district court erred in holding that Captain Nicholls could bind CJ II to Clause 14 ........ 35

A. FDDA waived any argument Captain Nicholls had actual authority to agree to Clause 14 ........ 36

B. FDDA failed to establish it reasonably believed, at the relevant time, that the SRO was executed by the Yacht's captain ........ 37

C. FDDA failed to prove Nicholls had apparent authority to agree to Clause 14 .......... 40

1. Review is *de novo* (but CJ II wins under any standard) .......... 40

2. FDDA failed to meet its burden to prove that Clause 14 is usual in the industry .......... 43

3. *Coastal Iron Works* does not control .......... 47

III. Even if Clause 14 is enforceable under maritime law, CJ II is still entitled to full recovery .......... 49

IV. The district court erred in denying CJ II lost charter damages .......... 52

CONCLUSION .......... 56

CERTIFICATE OF SERVICE .......... 56

CERTIFICATE OF COMPLIANCE .......... 57

ECF CERTIFICATION .......... 59

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alan, Sean & Koule, Inc. v. SV/CORSTA V*,
286 F. Supp. 2d 1367 (S.D. Ga. 2003) ....................50

*Alcoa S.S. Co. v. Charles Ferran & Co.*,
383 F.2d 46 (5th Cir. 1967).................... 19, 24, 46

*Am. Guar. & Liab. Ins. Co. v. ACE Am. Ins. Co.*,
990 F.3d 842 (5th Cir. 2021) ....................6

*Aponte v. Calderon*,
284 F.3d 184 (1st Cir. 2002).................... 55

*Ayoub v. I.N.S.*,
222 F.3d 214 (5th Cir.2000).................... 13

*Barrios v. Centaur, L.L.C.*,
121 F.4th 515 (5th Cir. 2024)....................9

*Bisso v. Inland Waterways Corp.*,
349 U.S. 85 (1955).................... 19, 32

*Blankenship v. Spectra Energy Corp.*,
No. 13-12-00546-CV, 2013 WL 4334306 (Tex. App.—Corpus
Christi Aug. 15, 2013, no pet.).................... 51

*Bogue Elec. Mfg. Co. v. Coconut Grove Bank*,
269 F.2d 1 (5th Cir. 1959)....................36

*Branch-Hines v. Hebert*,
939 F.2d 1311 (5th Cir. 1991) .................... 37

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
345 F.3d 347 (5th Cir. 2003) ....................40

*Brief for Appellee, Farina v. Mt. Bachelor, Inc.*,
1994 WL 16058533 (9th Cir. July 6, 1994) .................... 15



112742503

*Broadley v. Mashpee Neck Marina, Inc.*,
471 F.3d 272 (1st Cir. 2006) .......... 16, 17, 18, 33

*Cactus Pipe & Supply Co. v. M/V Montmartre*,
756 F.2d 1103 (5th Cir. 1985) .......... 49

*Canal Barge Co. v. Torco Oil Co.*,
220 F.3d 370 (5th Cir. 2000) .......... 53, 56

*Caris MPI, Inc. v. UnitedHealthcare, Inc.*,
108 F.4th 340 (5th Cir. 2024) .......... 14

*Chembulk Trading LLC v. Chemex Ltd.*,
393 F.3d 550 (5th Cir. 2004) .......... 24

*City of Alexandria v. Brown*,
740 F.3d 339 (5th Cir. 2014) .......... 6

*Coastal Iron Works Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*,
783 F.2d 577 (5th Cir. 1986) .......... *passim*

*Consol. Gas Supply Co. v. F.E.R.C.*,
745 F.2d 281 (4th Cir.1984) .......... 34

*Corbitt v. Diamond M. Drilling Co.*,
654 F.2d 329 (5th Cir. Unit A. 1981) .......... 32

*Cox v. Esso Shipping Co.*,
247 F.2d 629 (5th Cir. 1957) .......... 48, 49

*Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*,
116 F.3d 1095 (5th Cir. 1997) .......... 8

*DDD Energy, Inc. v. Veritas DGC Land, Inc.*,
60 S.W.3d 880 (Tex. App.—Houston [14th Dist.] 2001, no pet.) .......... 51

*Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*,
974 F.3d 601 (5th Cir. 2020) .......... 6

*Deperrodil v. Bozovic Marine, Inc.*,
842 F.3d 352 (5th Cir. 2016) .......... xvi

*Diesel "Repower", Inc. v. Islander Invs. Ltd.*,
271 F.3d 1318 (11th Cir. 2001) .......... 27, 28

*Edward Leasing Corp. v. Uhlig & Assocs., Inc.*,
785 F.2d 877 (11th Cir. 1986) .......... 19, 33

*Elgie & Co. v. S.S.S.A. Nederburg*,
599 F.2d 1177 (2d Cir. 1979) .......... 9

*Eni US Operating Co. v. Transocean Offshore Deepwater Drilling, Inc.*,
919 F.3d 931 (5th Cir. 2019) .......... 7, 31, 43

*ENSCO Offshore, L.L.C. v. Cantium, L.L.C.*,
No. 24-30508, 2025 WL 3552768 (5th Cir. Dec. 11, 2025) .......... *passim*

*Excel Modular Scaffold & Leasing Co. v. OSHRC*,
943 F.3d 748 (5th Cir. 2019) .......... 38

*Fahey v. Gledhill*,
663 P.2d 197 (Cal. 1983) .......... 34, 35, 36

*Farina v. Mt. Bachelor, Inc.*,
66 F.3d 233 (9th Cir. 1995) .......... 15

*Findley v. Red Top Super Mkts.*,
188 F.2d 834 (5th Cir. 1951) .......... 39

*Franklin v. Regions Bank*,
37 F.4th 986 (5th Cir. 2022) .......... 9

*Frota Oceanica Brasileira S.A. v. M/V Alice St. Philip*,
790 F.2d 412 (5th Cir. 1986) .......... 47

*Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*,
697 F.3d 59 (2d Cir. 2012) .......... 36

*Gilbane Bldg. Co. v. Admiral Ins. Co.*,
664 F.3d 589 (5th Cir. 2011) .......... 31

*Great Lakes Ins. SE v. Raiders Retreat Realty Co.*,
601 U.S. 65 (2024) .......... 50

*Ham Marine, Inc. v. Dresser Indus., Inc.*,
72 F.3d 454 (5th Cir. 1995)....................36

*Holland v. Florida*,
560 U.S. 631 (2010).................... 11

*Hous. Expl. Co. v. Halliburton Energy Servs., Inc.*,
269 F.3d 528 (5th Cir. 2001) ....................11, 43

*Imation Corp. v. Koninklijke Philips Elecs. N.V.*,
586 F.3d 980 (Fed.Cir.2009)....................34

*IMTT-Gretna v. Robert E. Lee SS*,
993 F.2d 1193 (5th Cir. 1993)....................14

*Int'l Shipbreaking Ltd. LLC v. Smith*,
44 F. App'x 653, 2002 WL 1397097 (5th Cir. 2002)....................25

*Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*,
519 F.2d 171 (5th Cir. 1975)....................30

*John Allan Co. v. Craig Allen Co.*,
540 F.3d 1133 (10th Cir. 2008) .................... 6, 55

*La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R.*,
124 F.3d 10 (1st Cir. 1997)....................13, 19

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*,
199 F.3d 220 (5th Cir. 1999)....................36

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ....................20

*Lee Lewis Constr., Inc. v. Harrison*,
64 S.W.3d 1 (Tex. App.—Amarillo 1999), *aff'd*, 70 S.W.3d 778
(Tex. 2001).................... 51

*Lee Lewis Constr., Inc. v. Harrison*,
70 S.W.3d 778 (Tex. 2001)....................12

*M/S Bremen v. Zapata Off-Shore Co.*,
407 U.S. 1 (1972)....................28

*Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*,
817 F.3d 241 (5th Cir. 2016) .......... 36

*Marine Diesel Specialists, Inc. v. M/Y "BG3"*,
No. 18-60037-CIV-SNOW, 2020 WL 2929839 (S.D. Fla. Jan.17, 2020) .......... 26, 27, 28

*MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*,
544 F. Supp. 3d 1334 (S.D. Fla. 2021) .......... 54

*Nathaniel Shipping, Inc. v. Gen. Elec. Co.*,
920 F.2d 1256 (5th Cir. 1991) .......... 33

*Newport News Shipbuilding & Dry Dock Co. v. United States*,
226 F.2d 137 (4th Cir. 1955) .......... 19

*Ochoa-Salgado v. Garland*,
5 F.4th 615 (5th Cir. 2021) .......... 15

*Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank & Tr. Co.*,
740 F.2d 1384 (7th Cir. 1984) .......... 44

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*,
648 F.3d 258 (5th Cir. 2011) .......... xvi, 8

*Pulsifer v. United States*,
601 U.S. 124 (2024) .......... 42

*Rosewood Props. Co., Inc. v. Mary Hill and Gary C. Smith, Pro. Corp.*,
No. 05-91-00590-CV, 1992 WL 178599 (Tex. App.—Dallas July 28, 1992, writ denied) .......... 51

*Royal Insurance Co. of Am. v. S.W. Marine*,
194 F.3d 1009 (9th Cir. 1999) .......... 13

*Safeway, Inc. v. PDX, Inc.*,
676 F. App'x 229 (5th Cir. 2017) .......... 52

*Sander v. Alexander Richardson Invs.*,
334 F.3d 712 (8th Cir. 2003) .......... 14, 20, 22, 32

*SCF Waxler Marine, L.L.C. v. Aris T M/V*,
24 F.4th 458 (5th Cir. 2022) ........................................................................ 6, 43

*Sing Fuels Pte Ltd. v. M/V Lila Shanghai*,
39 F.4th 263 (4th Cir. 2022) ..........................................................................44

*Sundown Energy LP v. HJSA No.3, Ltd. P'ship*,
622 S.W.3d 884 (Tex. 2021) ..........................................................................52

*Sydlik v. REEIII, Inc.*,
195 S.W.3d 329 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ................... 51

*Tesone v. Empire Mktg. Strategies*,
942 F.3d 979 (10th Cir. 2019)........................................................................ 21

*Theriot v. Bay Drilling Corp.*,
783 F.2d 527 (5th Cir. 1986)............................................................. 20, 21, 22

*Thomas v. Atl. Coast Line R. Co.*,
201 F.2d 167 (5th Cir. 1953) ......................................................................... 16

*Thompson v. Over the Line VI, LLC*,
No. 23-3110, 2025 WL 314805 (3d Cir. Jan. 28, 2025).....................................28

*Three Fifty Mkts., Ltd. v. Argos M M/V*,
__ F.4th __, 2026 WL 265790 (5th Cir. 2026)................................................40

*Three-Seventy Leasing Corp. v. Ampex Corp.*,
528 F.2d 993 (5th Cir. 1976)...........................................................................45

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
674 F.2d 401 (5th Cir. 1982) ....................................................................*passim*

*Travelers Cas. & Sur. Co. of Am. v. United States*,
75 Fed.Cl. 696 (2007) .....................................................................................42

*Union Tex. Petrol. Corp. v. PLT Eng'r, Inc.*,
895 F.2d 1043 (5th Cir. 1990)......................................................................... 21

*United States v. Hernandez*,
159 F.4th 425 (5th Cir. 2025) .........................................................................23

*United States v. Lopez*,
998 F.3d 431 (9th Cir. 2021)....................42

*Weathers v. Hous. Methodist Hosp.*,
116 F.4th 324 (5th Cir. 2024).................... 11

**Statutes**

28 U.S.C. § 1291....................xvi

28 U.S.C. § 1333(1)....................xvi

Tex. Bus. & Com. Code § 2.715(a)....................42

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116-20 (2012)....................42

CPI Inflation Calculator, Bureau of Labor Statistics,
https://www.bls.gov/data/....................25

Fed. R. App. P. 4(a)(1)(A)....................xvi

Fed. R. App. P. 32(a)(5)....................58

Fed. R. App. P. 32(a)(6)....................58

Fed. R. App. P. 32(f)....................58

Restatement (Second) of Agency § 7....................48

Restatement (Second) of Agency § 35.................... 41

Restatement (Second) of Agency § 50....................40

Restatement (Second) of Agency § 51.................... 41, 44

Restatement (Second) of Agency § 51(a)....................43

Restatement (Second) of Agency §51(b) & cmt. c.................... 41

Restatement (Third) of Agency § 2.01 cmt. d....................49

Restatement (Third) of Agency § 2.03 .......... 44

Restatement (Third) of Agency § 2.03 cmt. d .......... 44, 45

*Usual*, Black's Law Dictionary (12th ed. 2024) .......... 44

8 Williston on Contracts § 19:24 (4th ed. May 2025 update) .......... 16

## JURISDICTIONAL STATEMENT

(A) Pursuant to 28 U.S.C. § 1333(1), the district court had admiralty jurisdiction because CJ II's negligence claim arose under maritime law. *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 356 (5th Cir. 2016); *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).

(B) This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a final judgment. ROA.2512.

(C) The district court entered its final judgment on September 3, 2025. ROA.2512. CJ II filed a notice of appeal on October 3, 2025. ROA.2513. Therefore, this appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that the one-sided limitation-of-liability clause ("Clause 14") in FDDA's May 29, 2018, service repair order (the "SRO") is enforceable.

2. Whether the district court erred in finding that the captain of CJ II's yacht had apparent authority to agree to all of the SRO's terms, including Clause 14 and an indemnity provision ("Clause 12") that requires CJ II to fully indemnify FDDA—but not vice versa.

3. Whether Texas' express negligence rule applies and precludes interpreting the SRO to limit CJ II's damages caused by FDDA's negligence.

4. Whether the district court clearly erred in finding that CJ II failed to establish its lost charter damages with reasonable certainty.

# INTRODUCTION

FDDA negligently serviced the engines of CJ II's $15 million yacht ("Yacht"). FDDA's negligence caused CJ II to suffer millions of dollars in damages when sea water sprayed through the Yacht's engine room during a sea trial on August 24, 2018.

Yet FDDA will get off scot-free absent the Court's intervention. Why? FDDA, as the exclusive servicer of the engines in the region, presented the Yacht's captain with a one-sided form contract—the SRO—and the captain signed it. (If he hadn't, and CJ II engaged an unauthorized servicer, the engines' warranty would be void.) Clause 14 in the SRO precludes holding FDDA liable for any non-direct damages, and limits FDDA's "maximum liability" to "the purchase price of the products" on which the claim is based.

The district court held that Clause 14 is enforceable and limits CJ II's recovery to a mere refund of what it paid for FDDA's negligent work: $10,000.62, about .3% of CJ II's damages. This unconscionable outcome should not stand. A yacht servicer should not be able to impose contractual terms that encourage its own negligence and even gross negligence. Nor should a captain have apparent authority to bind his principal to all terms in a service contract, no matter how detrimental to the principal's rights, merely because he has authority to purchase the underlying services. CJ II is entitled to recover all of its damages for FDDA's negligence.

## STATEMENT OF THE CASE

### A. CJ II buys the Yacht

Barry Skolnick resides in South Florida and used CJ II, a Delaware LLC, to purchase and maintain the Yacht, which is equipped with two engines manufactured by a Rolls-Royce subsidiary. ROA.2445-47. Azimut Benetti designed and built the Yacht in Italy alongside its twin-sister vessel, the Skylar. *Id.* Construction took three years, after which Skolnick took the Yacht on a 73-day maiden voyage around the Mediterranean. ROA.2448. The voyage succeeded, and in December 2017 the builder delivered the Yacht to CJ II in South Florida. *Id.*

### B. Staffing the Yacht and preparing for charter

Skolnick "absolutely" planned to charter the Yacht even before it was built, as a way to offset the expense of ownership. ROA.2963-64. In February 2018, he contracted with Burgess Yachts, a management company, to staff the Yacht. ROA.2447-48, 2452, 2456, 2487. Through this arrangement, Burgess hired Anthony Nicholls as captain and Anthony Waugh as chief engineer. ROA.2453.

Burgess was "very excited" to get the charter "ball rolling," and in March and April 2018 discussed with Skolnick, *inter alia*, a charter agreement, the available charter market for the Yacht, expected charter rates, and miscellaneous items such as suggested maritime "toys" for the Yacht. ROA.2449-52. However, as the Yacht

was undergoing minor repairs between February and April 2018, Skolnick did not rush to sign the charter agreement with Burgess. *Id.*

### C. Engine troubles

The Yacht began to suffer engine issues in April 2018. ROA.2457. CJ II hired FDDA, the exclusive servicer of the Yacht's engines in South Florida, to perform repairs. ROA.2457. Hiring FDDA was nonoptional—the engines' warranty would be void if CJ II engaged an unauthorized servicer. *Id.* FDDA technicians serviced the Yacht's engines on three occasions. ROA.2457-61.

On April 24, 2018, an unknown FDDA technician visited the Yacht but could not find the problem. ROA.2457-58. Engineer Waugh signed the service order. *Id.*

On May 11, 2018, CJ II called FDDA for engine start-up issues. ROA.2458-60. FDDA sent Tyler Jakubas to the Yacht, and he recommended that CJ II replace a fuel filter. *Id.* Engineer Waugh agreed, and Jakubas replaced the filter on May 18. *Id.* Engineer Waugh signed the service order. *Id.*

With the Yacht seemingly repaired, Captain Nicholls took it for a sea trial on May 24, 2018. ROA.2460. The Yacht's engines shut down shortly after entering open water, and CJ II called FDDA to investigate. ROA.2460-61. On May 29, FDDA dispatched Jakubas, who removed heat exchanger plates to assess if the engines' cooling system was working. ROA.2461-62. "To access and remove the heat-

exchanger plates, Jakubas had to remove" a black rubber water supply hose. ROA.2461-65. Jakubas serviced the plates over three days. *Id.* On May 31, Captain Nicholls signed the SRO, which is dated May 29, 2018, and bears the engineer's phone number. *Id.*; *id.* at 5316, 6015. On June 1, Jakubas finished servicing the plates and negligently reinstalled the black rubber hose. ROA.2468-72. FDDA's invoice for Jakubas' work under the SRO was $10,000.62, which was charged to CJ II's credit card. ROA.2475.

### D. The incident

On August 24, 2018, Captain Nicholls took the Yacht out for another sea trial. ROA.2476-77. Ninety minutes into the trial, the Yacht's power died. ROA.2477-79. The crew found that the "black rubber elbow hose had 'popped off'" and sprayed water all over the Yacht's electrical controls, causing extensive—and expensive—damage that left CJ II out of commission for years. ROA.2479-83. Jakubas' negligence in failing to properly fasten the hose on reinstallation caused the sea-spray incident. ROA.2485, 2498. FDDA issued "goodwill" post-incident payments to CJ II totaling $90,000.00. ROA.2484-85. As the payments came nowhere close to reimbursing the damage, CJ II filed suit. *Id.*

### E. Procedural history

The case proceeded to a multi-day bench trial. The district court found FDDA's negligence caused the sea-spray incident, and that CJ II proved direct and

loss of personal use damages. ROA.2493-98. However, the district court concluded that: (1) Clause 14 is enforceable; (2) Captain Nicholls bound CJ II to Clause 14; (3) Clause 14 limited CJ II's recovery to direct damages equaling the contract purchase price; and (4) CJ II failed to prove its loss of charter damages. ROA.2496, 2503-08. CJ II appeals these four rulings. ROA.2513.

## SUMMARY OF ARGUMENT

1. The district court erred in finding Clause 14 enforceable for two separate reasons. First, it violates public policy by permitting FDDA to escape gross negligence liability. Second, Clause 14 provides no meaningful deterrence even as to ordinary negligence, was the product of unequal bargaining power, and does not sufficiently express FDDA's attempt to limit its liability.

2. The district court erred in finding that Captain Nicholls bound CJ II to Clause 14 because FDDA failed to prove that Captain Nicholls had apparent authority to agree to Clause 14.

3. The district court erred in interpreting Clause 14 to limit CJ II's recovery because Clause 14 fails to satisfy Texas' express negligence rule.

4. The district court clearly erred in finding that CJ II is not entitled to lost charter damages by issuing inconsistent findings.

## STANDARD OF REVIEW

Legal conclusions in a bench trial judgment are reviewed de novo. *Am. Guar. & Liab. Ins. Co. v. ACE Am. Ins. Co.*, 990 F.3d 842, 846 (5th Cir. 2021). Findings of fact (including damage calculations) are reviewed for clear error. *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co.*, 974 F.3d 601, 606-07 (5th Cir. 2020). Factual findings may be overturned if they are without substantial supporting evidence, the district court misinterpreted the evidence's effect, or its determinations were against the preponderance of credible testimony. *City of Alexandria v. Brown*, 740 F.3d 339, 352-53 (5th Cir. 2014). Also, "internally inconsistent findings constitute clear error." *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1139 (10th Cir. 2008).

"[W]hen factual findings in an admiralty case" are "based on an incorrect legal principle," the clearly erroneous standard does not apply and the findings are disregarded. *SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 470 (5th Cir. 2022). Relatedly, "implicit findings will not automatically be inferred to support a conclusory ultimate finding"; "the district court must lay out enough subsidiary findings to allow [the appellate court] to glean a clear understanding of the analytical process by which the ultimate findings were reached and to assure that the trial court took care in ascertaining the facts." *Eni US Operating Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 936 (5th Cir. 2019).

# ARGUMENT

## I. The district court erred in holding that Clause 14 limits CJ II's recovery

Clause 14 in the May 29, 2018 SRO purports to completely absolve FDDA's liability beyond the cost of the repair services that FDDA provides. ROA.6015-17. Clause 14 has two parts.

Clause 14's first sentence *completely* excludes liability for, *inter alia*, "incidental" and "indirect or consequential damages" arising from "any breach of warranty or the failure of either party to fully perform" their obligations. ROA.6017. The district court found that this part of Clause 14 effectively barred CJ II's recovery of the loss of personal use and charter damages. ROA.2506.

Clause 14's second sentence limits FDDA's "maximum liability" on "any claim" brought by CJ II to "the purchase price of the products" on which the claim is based. ROA.6017. Because CJ II paid FDDA $10,000.62 under the SRO, the district court found that this part of Clause 14 capped CJ II's direct damages at that amount. ROA.2506-07. That is, under Clause 14, CJ II is entitled to a refund of the money it paid FDDA for its negligent work, nothing more, and FDDA walks away without paying a penny for the damages its negligence caused to the Yacht.

Despite the severe consequences of Clause 14, the district court found it enforceable because (1) maritime law permits enforcement of so-called "red-letter" clauses like Clause 14; (2) the parties had equal bargaining power; and (3) the

exculpatory language was clearly expressed. ROA.2503-04. The district court's judgment must be overturned. Clause 14 is unenforceable because it functionally immunizes FDDA from the consequences of gross negligence.

Moreover, FDDA failed to establish that (1) Clause 14 adequately deters negligence; (2) the parties had equal bargaining power under the particular circumstances; and (3) Clause 14 clearly and unequivocally demonstrates FDDA's intent to disclaim liability beyond the purchase price—any one of which precludes enforcement. *Craddock Int'l Inc. v. W.K.P. Wilson & Son, Inc.*, 116 F.3d 1095, 1105 (5th Cir. 1997) ("A limitation of liability is, in general, a defensive matter that must be raised in the trial court by the party seeking to benefit from the limitation.").

**A. Maritime contract law**

"A contract for the repair of a vessel," like the SRO, "is a maritime contract, governed by general maritime law." *One Beacon Ins. Co.*, 648 F.3d at 262. Basic contract construction principles apply: words and phrases must be given their ordinary meanings; meaning must be given to all of the terms, presuming that every provision was intended to accomplish some purpose; and the contract must be read as a whole. *Barrios v. Centaur, L.L.C.*, 121 F.4th 515, 518 (5th Cir. 2024). "[S]tate law may supplement maritime law where maritime law is silent." *Coastal Iron Works Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986).

The Court reviews the district court's rulings on Clause 14 *de novo*, mindful that exculpatory provisions are disfavored. *Franklin v. Regions Bank*, 37 F.4th 986, 994 (5th Cir. 2022); *Elgie & Co. v. S.S.S.A. Nederburg*, 599 F.2d 1177, 1183 (2d Cir. 1979).

### B. Clause 14 is unenforceable because it exculpates FDDA for gross negligence

The Court recently decided *ENSCO Offshore*, which involved the enforceability of a mutual indemnification provision in a maritime oilfield contract. 2025 WL 3552768. Judge Elrod concurred with the majority but wrote separately to highlight "an unsettled question in [the Fifth Circuit's] law of maritime contract pertaining to exemptions from liability for acts of gross negligence." *Id.* at *3.

Judge Elrod noted that in *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401 (5th Cir. 1982), the Court evaluated the enforceability of "a ship-repair contract containing a red-letter clause that limited the shipyard's liability to $300,000." *Id.* Judge Elrod explained that *Todd Shipyards* states that "gross negligence will invalidate an exemption from liability." *Id.* (quotation omitted).

But Judge Elrod noted that just four years later in *Coastal Iron Works* the Court issued another opinion involving a similar clause and "suggested that parties can, in fact, contract to limit liability for gross negligence." *Id.* Because of the Court's inconsistent decisions on "this important question," Judge Elrod explained that the Court "owe[s] it to both those entering maritime contracts and district courts to

provide greater clarity regarding the validity of these indemnifications and limitations of liability for gross negligence." *Id.* at *3-4.

This is the case for the Court to provide definitive guidance. As Judge Elrod recognized, the district court here "followed *Coastal IronWorks*' guidance without discussing how this instruction coheres with our opinion in *Todd Shipyards*." *Id.* (citing *Constance Joy II, LLC v. Stewart & Stevenson FDDA LLC*, No. 4:20-cv-02967, 2025 WL 2529645, at *41 (S.D. Tex. Sept. 3, 2025)). That is; in deciding the legal question of the SRO's enforceability, the district court fell victim to the Court's seemingly inconsistent holdings. Its error should be corrected, especially considering the importance of the issue's resolution to the maritime industry.[1]

#### 1. Clause 14 broadly allows FDDA to escape liability for grossly negligent conduct

"[I]t has been aptly said that gross negligence is ordinary negligence with a vituperative epithet added." *Holland v. Florida*, 560 U.S. 631, 658 (2010) (Alito, J., concurring in part and concurring in judgment). The Court sitting in admiralty jurisdiction has explained that gross negligence has a reckless or intentional nature,

[1] This issue is properly raised on appeal because (1) it presents a "purely legal" question; (2) Clause 14 is unconscionable; and (3) the district court fell prey to the Court's seemingly inconsistent holdings. *Weathers v. Hous. Methodist Hosp.*, 116 F.4th 324, 329 (5th Cir. 2024) (per curiam) (quotation omitted). These latter two factors show the existence "of extraordinary circumstances," especially given the importance of the issue's resolution to the maritime industry. *Id.* (quotation omitted).

not to be confused with "[m]ere inadvertence or honest mistake." *Hous. Expl. Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 532 (5th Cir. 2001).

Here, the district court bolded and underlined the following language from the first sentence of Clause 14 and found that it unambiguously *completely* bars CJ II's recovery of "incidental, indirect, or consequential damages":

> Clause 14 excludes liability for all claims [that] 'aris[e] from ... **any breach of warranty or the failure of either Party to fully perform this Agreement, even if a Party was aware of the possibility of the other Party sustaining such damages**.

ROA.2506 (ellipses in original). The sentence imposes this bar even when FDDA is aware that its action might harm its customer. *Id.* And the second sentence of Clause 14 limits "Seller's maximum liability"—but not the Buyer's—to the amount of the "purchase price of the products on which the claim is based," regardless of the damage type. ROA.6017.

This means that FDDA, as Seller, can act with "actual, subjective awareness of the risk involved" and "proceed in conscious indifference to the rights, safety, or welfare of others," knowing that any harm it causes to a customer through such gross negligence will be capped at the purchase price. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). Thus, if the customer pays FDDA the purchase price

before discovering FDDA's gross negligence, as CJ II did here, FDDA's maximum liability is capped at a refund.

Taken together, Clause 14 completely exculpates FDDA's gross negligence liability in connection with all non-direct damages, and shields FDDA (but not its customer) from direct damages resulting from gross negligence if they are greater than the invoiced amount. Thus, Clause 14 allows FDDA to engage in grossly negligent conduct with minimal consequences, if any at all. The district court erred in enforcing the clause.

#### 2. Red-letter clauses that limit recovery for gross negligence are unenforceable in the Fifth Circuit

As explained *supra*, there is "tension" and "confusion" in the Fifth Circuit's maritime case law "regarding the validity" of "indemnifications and limitations of liability for gross negligence." *ENSCO Offshore*, 2025 WL 3552768, at *3-4. Respectfully, the case law does not allow a party to contract out of liability for gross negligence.

*Todd Shipyards* states that gross negligence "invalidate[s] an exemption from liability." 674 F.2d at 411. This is "bolstered by other circuits." *Ayoub v. I.N.S.*, 222 F.3d 214, 215 (5th Cir. 2000) (holding dictum "conclusively answer[ed]" question); *ENSCO Offshore*, 2025 WL 3552768, at *3 ("At least two other circuits and several

district courts in our circuit have looked to and approvingly cited this language from *Todd Shipyards*." (collecting cases)).

For example, the First Circuit held in *La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R.*, 124 F.3d 10, 19 (1st Cir. 1997), that a red-letter clause "may not limit liability on a marine contract for gross negligence because harm willfully inflicted or caused by gross or wanton negligence, operates to invalidate an exemption from liability." (citation modified). In *Royal Insurance Co. of Am. v. S.W. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999), the Ninth Circuit held "that a party to a maritime contract should not be permitted to shield itself contractually from liability for gross negligence." In fact, under maritime law, "no circuit has allowed a party to absolve itself from higher levels of culpability, including gross negligence or recklessness." *Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 717 n.3 (8th Cir. 2003). The Court should not be the first to do so, ensuring that maritime law "maintain[s] its uniformity." *IMTT-Gretna v. Robert E. Lee SS*, 993 F.2d 1193, 1195 (5th Cir. 1993).

To the extent *Todd Shipyards* and *Coastal Iron Works* are inconsistent, *Todd Shipyards* controls because it is "the earlier opinion" (1982 vs. 1986). *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 350 (5th Cir. 2024) ("When panel opinions appear to conflict, we are bound to follow the earlier opinion." (citation modified)).

Even if *Todd Shipyards*'s statement on gross negligence is construed as dictum, it remains highly persuasive. This is especially so considering *Coastal Iron Works*'s statement that "[a] shipyard contract limiting liability will be upheld so long as the parties to the contract have more or less equal bargaining strength," did not contemplate the effect of a gross negligence release on a red-letter clause. 783 F.2d at 583. Any assumption in *Coastal Iron Works* as to the validity of red-letter clauses that bar recovery for gross negligence is not a "reasoned consideration" and thus cannot "operate[] as binding precedent" under the Rule of Orderliness. *Ochoa-Salgado v. Garland*, 5 F.4th 615, 619-20 (5th Cir. 2021). Thus, *Todd Shipyards* controls.

### 3. Clause 14 is invalid even if only ordinary negligence is at issue

Assuming the Court follows *Todd Shipyards*, the district court erred in enforcing Clause 14 against CJ II notwithstanding that this case involves only FDDA's ordinary negligence.

As discussed, Clause 14 prevents recovery for gross negligence that results in consequential and indirect damages and limits direct damages stemming from FDDA's gross negligence to the point of meaninglessness. "This attempt to escape liability for more than ordinary negligence renders the release clause invalid," regardless of whether FDDA was grossly negligent in this case. *Farina v. Mt. Bachelor, Inc.*, 66 F.3d 233, 235-36 (9th Cir. 1995) (holding that limitation of liability clause was

unenforceable because it allowed defendant to avoid liability for gross negligence, even though the plaintiff only claimed ordinary negligence); *see Brief for Appellee, Farina v. Mt. Bachelor, Inc.*, 1994 WL 16058533, at *25-26 (9th Cir. July 6, 1994) (explaining that the district court declined to reach the issue of whether the release was illegal because it covered gross negligence as the "case does not involve any allegation of gross negligence").

The Ninth Circuit correctly reached the validity of the release clause that the defendant sought to enforce in *Farina*, irrespective of the lack of gross negligence allegations, because "[a]n attempted exemption from liability ... for a future willful or grossly negligent act is generally held void." 8 Williston on Contracts § 19:24 (4th ed. May 2025 update) (collecting authorities including *Thomas v. Atl. Coast Line R. Co.*, 201 F.2d 167 (5th Cir. 1953)).

In *Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272, 273 (1st Cir. 2006), for example, the plaintiff (as here) brought a claim for ordinary negligence, and the defendant (as here) argued that a red-letter clause covering "'any claims, demands, [and] causes of action of any kind and nature'" prevented the plaintiff's recovery. The district court found that the clause was too broad as written, since it failed to distinguish between ordinary and gross negligence, so it reformed the clause to cover ordinary negligence and found that it was enforceable. *Id.*

On appeal, however, the First Circuit framed the question as "whether a court should be willing to narrow the clause and apply it only to the extent that it excludes liability for simple negligence." *Id.* at 275. The First Circuit viewed this question in terms of "whether the clause represents fair dealing so that a judicial narrowing is sound public policy," focusing on three primary considerations, each of which tracks perfectly with this case. *Id.*

First, the *Broadley* red-letter clause served to "discourage perfectly legitimate claims" because it was substantially overbroad and provided for attorney's fees. 471 F.3d at 275. Clause 14 is similarly overbroad, as it covers "all claims," including gross negligence. ROA.6017. Moreover, Clause 14 must be read in conjunction with the other provisions of the SRO, including Clause 12's one-sided indemnity. Clause 12 requires CJ II to indemnify and hold FDDA harmless from and against "any and all losses, damages, injuries, [and] claims" and "expenses (including reasonable attorney fees and other legal expenses) of whatsoever kind and nature" that are "related to or arising out of this agreement." Thus, just as in *Broadley*, the sheer breadth of Clause 14 and the consequences for bringing valid claims provides FDDA's injured customers with "ample reason to hesitate about suing: time, uncertainty, [and] expenses." 471 F.3d at 275.

Second, the First Circuit expressed concern that "although the [*Broadley*] clause literally encompasses negligence," it "never says that it exempts [the defendant] from negligence." *Id.* The court held that such language "is less likely to convey an *effective* warning to the reader than would a clear and specific disclaimer of liability for *negligence*." *Id.* Just as in *Broadley*, Clause 14 contains no reference to negligence whatsoever, and it is insufficient that the clause's applicability to "all claims" might technically cover negligence.

Last, the First Circuit emphasized that no party ever suggested that the terms were negotiated, rather, it was "a typical case of boilerplate." *Broadley*, 471 F.3d at 276. Given the form-nature of the contract, the First Circuit refused "to rescue the contract from overbreadth." *Id.* Similarly, no party claims that Clause 14 (or, for that matter, any other part of the SRO) was ever negotiated. Rather, the FDDA contract is also boilerplate. Given the relative vulnerability of the buyer in ship repair contracts, particularly for repairs under warranty, it would be inequitable to allow such clauses in this context.

Thus, because of "the extreme overbreadth of the clause and the plainness of its illegality, the boilerplate character of the contract and lack of specific negotiation, the absence of an explicit reference to negligence which would provide better warning, and the attorney's fees clause," the First Circuit refused to reform the

*Broadley* contract to render it enforceable. 471 F.3d at 276. Each of the three *Broadley* factors is also present in this case. They demonstrate why Clause 14 is legally invalid as it effectively immunizes FDDA from the consequences of its gross negligence, and the Court should not save Clause 14 by narrowing its applicability. Therefore, in addition to direct damages, CJ II is entitled to recover consequential and other types of damages. The district court's holding to the contrary should be reversed.

### C. Clause 14 is unenforceable for reasons beyond its exculpation for gross negligence

Even assuming Clause 14 is not invalid as a matter of law because of its exculpation of gross negligence, Clause 14 remains unenforceable because it does not adequately deter ordinary negligence; the parties did not have equal bargaining power; and Clause 14 did not clearly and unequivocally indicate FDDA's intent to limit its negligence-based liability.

#### 1. Clause 14 is unenforceable because it provides no meaningful deterrent to negligence

Courts have refused to enforce "release-from-negligence contracts" for two primary reasons: "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 90-91 (1955). "The dangers of modern machines make it all the more necessary that negligence be discouraged." *Id.* at 91.

While *Bisso* arose in the context of towage contracts, this Court and other circuits have held that these considerations apply equally to ship repair contracts. *See Edward Leasing Corp. v. Uhlig & Assocs., Inc.*, 785 F.2d 877, 888 (11th Cir. 1986); *La Esperanza*, 124 F.3d at 19; *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 55 (5th Cir. 1967); *see also Newport News Shipbuilding & Dry Dock Co. v. United States*, 226 F.2d 137, 142-43 (4th Cir. 1955) (strictly construing a clause that purportedly exempted a shipyard from "liability for negligence in the repair of a vessel," in part, because such a provision is "of doubtful validity" in light of *Bisso*).

In this case, the district court recognized that red-letter clauses are typically unenforceable if they do not adequately deter negligence. So, it issued alternative rulings on the negligence-deterrent aspect of Clause 14's enforceability. It found that under *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir. 1986), "and for the reasons outlined" in *Sander*, 334 F.3d at 717-21, Clause 14 is enforceable as maritime law allows for contracts that "fully exculpate a party from its own negligence." ROA.2503-04 ("[Clause 14] is enforceable even if it offers no deterrent.").

In the alternative, the district court recognized that other circuits have enforced red-letter clauses in ship repair contracts if they "do not absolve all liability and still provide a deterrent to negligence." ROA.2503. The district court found that

Clause 14, in providing liability up to the invoiced amount, "does not fully absolve FDDA of liability" and adequately deterred negligence. *Id.*

The district court's findings are wrong as a matter of law.[2]

#### a. Ship repair contracts may not include red-letter clauses that fail to provide a deterrent to negligence

Contrary to the district court's reasoning, neither *Theriot* nor *Sander* suggests that a red-letter clause in a ship repair contract "is enforceable even if it offers no deterrent." ROA.2504.

In *Theriot*, the operator of an oil & gas lease—Houston Oil—contracted for the services of Bay Drilling and Oilfield Services. 783 F.2d at 531. Theriot slipped and fell on a drilling barge owned by Bay Drilling while working for Oilfield Services, and sued both entities for negligence. *Id.* at 530-31. Bay Drilling filed a third-party action against Houston Oil for indemnity under its drilling contract, alleging that Houston Oil agreed to take indemnify claims brought by Oilfield Services' employees against Bay Drilling. *Id.* at 538-41. The Court enforced the indemnity provision. *Id.*

---

[2] As the district court addressed these issues, they are properly before the Court. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995) ("[E]ven if this *were* a claim not raised by petitioner below, we would ordinarily feel free to address it since it was addressed by the court below."); *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 992 (10th Cir. 2019) ("When a district court has passed upon an issue, review ... is subject to the same standard of appellate review" as would otherwise be applicable (citation modified)).

However, the Court has "construe[d] *Theriot* narrowly and constrain[ed] it to its facts." *Union Tex. Petrol. Corp. v. PLT Eng'r, Inc.*, 895 F.2d 1043, 1049 (5th Cir. 1990). *Theriot*'s facts fundamentally differ from those at hand. The *Theriot* exculpatory provisions were for *mutual* indemnification and did not include a one-sided limitation on recoverable direct damages. Just as mutually assured destruction prevented atomic warfare in the past, so too does mutually assured indemnification deter negligence in the present. The same is not true for the *non*-mutual obligations in Clauses 12 and 14, under which *only* FDDA benefits. Thus, *Theriot* is inapposite.

The district court's other authority, *Sander*, also highlights the importance of distinguishing the contracting context. *Sander* involved a limitation of liability clause in a contract between boat owners and a marina for the storage of a houseboat, *i.e.*, a slip rental agreement. 334 F.3d at 713-14. The Eighth Circuit held that the red-letter clause was enforceable, but with an important caveat. *Id.* It recognized that ship repair contracts are distinguishable from slip rental agreements: "A ship repairer who takes control of a vessel and enters an agreement to perform work on the vessel is in a much different situation than a marina that provides a dock to which numerous boat owners have access and dock their boats." *Id.* at 719. Thus, the Eighth Circuit expressly limited its holding to the enforceability of red-letter clauses in slip rental agreements. *Id.* at 719, 721. By its own terms, therefore, *Sander* is also inapposite.

The weight of authority recognizes that the Supreme Court's "explication of law" in *Bisso* controls. *United States v. Hernandez*, 159 F.4th 425, 427 n.1 (5th Cir. 2025) ("[W]e are bound by the [Supreme] Court's explications of law, whether dicta or not."). A limitation of liability clause in a ship repair contract is unenforceable if, among other things, it does not adequately deter negligence. Thus, the operative question is not whether a ship repair contract is enforceable if it does not deter negligence. Rather, the issue here is whether, in limiting FDDA's "maximum liability for any claim" to the purchase price of a service repair order, Clause 14 *adequately* deters FDDA's negligence. It does not.

**b. In limiting CJ II to nothing more than a refund, Clause 14 is inadequate**

In this case, the purchase price was $10,000.62. The damages stemming from FDDA's negligence dwarf that amount: $647,093.51 in direct damages[3]; $1,930,945.00 in loss of personal use damages; and $1,285,875.00 in loss of charter revenue. ROA.2489. The total is $3,863,913.51—more than *386 times* the purchase price. A provision that limits liability to less than .3% of total damages cannot

[3] CJ II's direct damages are $90,000 higher, but the district court deducted FDDA's pre-litigation payments. ROA.2489, 2493. CJ II does not challenge that deduction.

adequately deter negligence. But Clause 14 is not just an inadequate deterrence in this case, it is inadequate in general.

Clause 14 entitles an injured buyer like CJ II to nothing more than a refund of the cost of FDDA's engine repair services. If, for example, FDDA charged $1,000 to a buyer's credit card for negligent work that led to the total destruction of a $15 million yacht, then FDDA would at most only be liable to refund the buyer's $1,000 under the district court's reasoning. That is, FDDA's "liability" would be nothing more than not getting paid for the negligent work that caused the injury in the first place. Maritime law does not permit the construction of contracts that leads to such "absurd consequences." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004).

In 1967, in *Alcoa Steamship*, this Court held that a red-letter clause capping a ship repairer's liability at $300,000, where the plaintiff shipowner sought up to $1,000,000 in damages for a vessel fire, was sufficient "to discourage negligence by making wrongdoers pay damages." 383 F.2d at 48, 55. This holding makes sense, as $300,000 conceivably provides for complete satisfaction in instances of lesser negligence, but also provides a reasonable cap adequate to deter greater negligence. Adjusted for inflation, $300,000 in 1967 would be approximately $2,900,000 today (an amount that would come much closer to making CJ II whole in this case). *See* CPI

Inflation Calculator, Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm. The industry obviously took notice of *Alcoa Steamship*.

In its 1982 *Todd Shipyards* opinion, the Court cited *Alcoa Steamship* and had "no difficulty in" upholding the validity of a red-letter clause in a ship repair contract that capped liability at $300,000. 674 F.2d at 410. The Court held the same again in 1986, in *Coastal Iron Works*. 783 F.2d at 583. Accordingly, red-letter clauses are upheld in the Fifth Circuit "where a party has retained sufficient exposure to liability to deter negligence." *Int'l Shipbreaking Ltd. LLC v. Smith*, 44 F. App'x 653, 2002 WL 1397097, at *4 (5th Cir. 2002). Perhaps a $300,000 damages cap in Clause 14 would have met this test—although $300,000 in 1967, 1982, or 1986 was worth much more than $300,000 today. But Clause 14 comes nowhere near that amount.

Indeed, the limited warranty in Clause 11 of the SRO indicates that even the paltry purchase price remedy in Clause 14 is illusory. Under Clause 11, "Seller will refund the purchase price of the defective Goods or Services, *at Seller's discretion* and as the exclusive remedy provided." ROA.6016-17. Meanwhile, the non-mutual indemnity in Clause 12 requires Buyers like CJ II to fully indemnify FDDA (but not vice versa), including if FDDA's negligence causes another "injury" or "death." ROA.6017. Thus, to use the prior illustration, if FDDA's $1,000 worth of negligent work causes the total destruction of a Buyer's yacht *and* injury to a third party, then

the Buyer *might* get a refund of the $1,000 at FDDA's discretion but *will* be on the hook to indemnify FDDA for the third party's injuries, including FDDA's "reasonable attorney fees and other legal expenses." *Id.*

The SRO does nothing to deter FDDA's negligence. Frankly, it does the opposite. No matter how slapdash its work, the worst that might happen to FDDA is that it does not get paid. This is inadequate as a matter of law.

#### c. The district court's reasoning rests on an inapposite Florida district court opinion

The district court scoured far and wide for cases supporting its conclusion that a maritime red-letter clause limiting liability to the purchase price adequately deters negligence. It found one: *Marine Diesel Specialists, Inc. v. M/Y "BG3"*, No. 18-60037-CIV-SNOW, 2020 WL 2929839 (S.D. Fla. Jan. 17, 2020). ROA.2503-04. However, the district court's reliance on *Marine Diesel* is a textbook illustration of how reading excerpts of a case in isolation to support a legal proposition is a dangerous tactic.

Yes, *Marine Diesel* addressed the enforceability of a red-letter clause that limited damages "to the amount invoiced ... for repairs, including parts and labor." 2020 WL 2929839, at *10. And yes, the district court did find such a limitation "provides a deterrent to negligence." *Id.* But that finding was unnecessary to the court's disposition and derived from completely inapposite facts. *Diesel "Repower",*

*Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318, 1325 (11th Cir. 2001) (recognizing that whether a red-letter clause adequately deters negligence is a "fact-specific inquiry").

In *Marine Diesel*, a ship repairer filed suit to collect unpaid amounts for work on a yacht. 2020 WL 2929839, at *1. The shipowner counterclaimed against the repairer for negligently causing damage to an awning. *Id.* The district court evaluated the red-letter clause in connection with the counterclaim, after first observing that the shipowner did "not assert a basis for the exercise of [the] Court's jurisdiction" over the counterclaim. *Id.* at *9-10. While the district court concluded that the clause was enforceable "even if a proper counterclaim had been brought," the *Marine Diesel* shipowner sought $23,707.72 in damages and the clause capped damages at the invoiced amount, $24,000.43. *Id.* at *9-10, 13. Thus, if successful, the shipowner would have recovered 100% of its damages even if its recovery were limited to the invoiced amount. However, the district court found that "the independent tort doctrine preclude[d] the counterclaim." *Id.* at *10.

By contrast, CJ II can only recover a refund amounting to less than 0.5% of its damages under Clause 14. Indeed, the May 29th SRO *does not* even guarantee a refund of the purchase price. Clause 11's "limited warranty" provides that FDDA *has the option* of "correct[ing]" defective services, but may, in its "sole discretion," "refund the purchase price of the defective Goods or Services," which would



112742503

constitute "the exclusive remedy provided." ROA.6016–17. When Clause 11 is read alongside Clause 14's cap of liability at "the purchase price of the products," it is clear that the only liability that FDDA *must* face is for the purchase price of the defective products. Such paltry liability does nothing to discourage negligence. *Id.*

At bottom, the policy of "'discourag[ing] negligence by making wrongdoers pay damages' applies here and in every case." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 24 at n.* (1972) (Douglas, J., dissenting) (quoting *Bisso*, 349 U.S. at 91). Accordingly, because Clause 14 did not adequately deter FDDA's negligence, it is unenforceable as a matter of law.

#### 2. Clause 14 is unenforceable because CJ II did not have equal bargaining power

"Exculpatory clauses may not be inflicted by a monopoly or a party with excessive bargaining power." *Thompson v. Over the Line VI, LLC*, No. 23-3110, 2025 WL 314805, at *2 (3d Cir. Jan. 28, 2025) (citation modified); *see Coastal Iron Works*, 783 F.2d at 583 ("A shipyard contract limiting liability will be upheld so long as the parties to the contract have more or less equal bargaining strength."); *Islander*, 271 F.3d at 1324 ("[T]he parties must be of equal bargaining power to prevent overreaching.").

The district court found that "Skolnick, an experienced boater of 40 years who employed a professional captain, had roughly equal bargaining strength with



112742503

FDDA." ROA.2503. The district court further found that, "[e]ven if FDDA had superior bargaining power," there was "no evidence that it exerted that power in this transaction." *Id.* Both of these legal conclusions are incorrect. Several facts that the district court failed to consider in context show that FDDA had, and exerted, its superior bargaining power over CJ II.

#### a. As the engines' exclusive warranty servicer in South Florida, FDDA had superior power

The district court found that the Yacht's engines were under warranty, so an accredited servicer needed to perform repairs lest the warranty be voided. ROA.2457. The district court also found that "FDDA is the exclusive service company for [the] engines in South Florida," and that "the Yacht was never functional" from "its delivery in 2017 through the August 24, 2018, sea-spray event." ROA.2457, 2508. But the district court failed to trace these findings to their logical conclusion: to maintain the valuable warranty on the engines—critical components of the $15 million Yacht—Skolnick essentially *had* to hire FDDA to perform engine repair services for CJ II.

The market here is service and repairs of warrantied Rolls-Royce engines in South Florida, a market in which FDDA holds a monopoly. The *only* way CJ II could have escaped utilizing FDDA would be through voiding its warranty by employing a different servicer or by hiring a towage service to take the Yacht out of South Florida.

Both options are unreasonable, leaving CJ II to reckon with FDDA purely on FDDA's terms. In failing to recognize CJ II's dependence on FDDA to fix the Yacht, the district court wrongly concluded the parties had equal bargaining power.

Furthermore, the bases for the district court's equality conclusion—Skolnick's boating experience and his hiring of a captain—should have been treated as irrelevant. It is undisputed that Skolnick did not negotiate the SRO, and did not even see Clause 14 until after filing suit. ROA.2485. The equal-bargaining-power requirement "is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow." *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir. 1975). "The rationale presupposes that the contracting parties have in fact considered the relative costs." *Id.* But here, Skolnick could not bargain with FDDA over the allocation of risk. ROA.2485.

Nor could Skolnick have bargained intelligently even if bargaining were possible, since Clause 14, unlike red-letter clauses at issue in *Todd Shipyards* and *Coastal Iron Works*, does not include a specific damages cap. Instead, Clause 14 amorphously caps damages at whatever FDDA decides to charge for its services. Thus, the district court's consideration of Skolnick's experience in the equal

bargaining calculus is entirely misplaced as it fails to consider the rationale that underpins this requirement.

### b. FDDA exerted its superior power

The district court also erred in concluding there was no evidence FDDA exerted its unequal power. FDDA, as the designated, exclusive warranty service company for the CJ II's engines, imposed numerous inequitable, lopsided conditions in the SRO because it had the power to do so.[4] FDDA required that CJ II:

1. **Fully indemnify FDDA for any harms that FDDA causes to third parties, with no mutual indemnification language** (Clause 12). "[I]ndemnity provisions effect an extraordinary result—exculpating a party from the consequences of its own negligence before that negligence even occurs." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 595 (5th Cir. 2011) (citation modified).

2. **Waive its right to trial by jury** (Clause 18).

3. **Litigate in Harris County, Texas** (Clause 19), away from the place of contracting, the Yacht's homeport, and the place of injury.

4. **Cap FDDA's "maximum liability for any claim" to "the purchase price for the products on which the claim is based"** (Clause 14).

---

[4] If the district court's conclusion that FDDA did not exercise its unequal bargaining power is a factual finding, it is owed no deference because there is no supporting factual basis for it. *See Eni US Operating*, 919 F.3d at 936.

These inequitable clauses demonstrate that CJ II was not "free of [FDDA's] monopolistic compulsions." *Bisso*, 349 U.S. at 91.

In the end, Skolnick—not a "large compan[y] with extensive commercial experience and dealings," *Coastal Iron Works*, 783 F.2d at 583—employed a captain and an engineer for a pleasure yacht—not a vessel that "traded commercially," *Todd Shipyards*, 674 F.2d at 407. The captain and engineer brought on FDDA to make repairs because the Yacht's engines were under a warranty that functionally *required* CJ II to hire FDDA. ROA.2457. FDDA then exercised its superior power by imposing, among other problematic clauses, severe boilerplate liability limitations. Accordingly, Clause 14 cannot be enforced.

#### 3. Clause 14 is unenforceable because it does not clearly express FDDA's intent to disclaim negligence liability

"[E]xculpatory clauses, whether fully exonerating a party from its own negligence or not, must be clearly and unequivocally expressed." *Sander*, 334 F.3d at 715 (citation omitted). They are subject to strict construction, and "should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. Unit A. 1981); *see Nathaniel Shipping, Inc. v. Gen. Elec. Co.*, 920 F.2d 1256, 1266 (5th Cir. 1991). Vague, conflicting, and

acontextual clauses in a maritime contract do not (and cannot) preclude a plaintiff's ability to recover its proven damages.

The district court erred when it found that Clause 14 covers FDDA's negligence, through use of terms like "any liability" and "any claim." ROA.6017. Just like the red-letter clause in *Broadley*, which covered "'any claims, demands, [and] causes of action of any kind and nature,'" Clause 14's language is unlikely "to convey an *effective* warning to the reader than would a clear and specific disclaimer of liability for *negligence*." 471 F.3d at 275. The *Broadley* court is not alone in finding that such opaque language fails to clearly express an exculpatory clause's intent.

In *Edward Leasing Corp.*, for example, the disputed clause, similar to Clause 14, provided that: "The company's liability on any claim of any kind ... shall in no case exceed the portion of the contract price allocable to the equipment or unit thereof which gives rise to the claim." 785 F.2d at 889 (alteration in original). Despite the clause limiting the defendant's liability to the contract price, the Eleventh Circuit held that—when read in context—the liability limitation was "confusing" and it was therefore "impossible to determine" the proper scope of the red-letter clause. *Id.*

Like the clause in *Edward Leasing*, Clause 14's language seeking to limit FDDA's liability on "any claim" to the purchase price CJ II paid under the SRO is "confusing" in context. Consider, for example, that the Clause 12 indemnity

provision expressly covers "negligence" and "any negligent act or omission" of FDDA, but references to "negligence" are notably missing from Clause 14. *See* ROA.6017 ("12. INDEMNITY (INCLUDING FOR NEGLIGENCE): … including without limitation any such losses arising in or from … tort … caused or occasioned by any negligent act or omission of seller … ") (capitalization and emphasis omitted).

"Where one provision of an agreement contains a particular reference, the omission of this reference from any similar provision ***must*** be assumed to have been intentional under accepted canons of contract construction." *Imation Corp. v. Koninklijke Philips Elecs. N.V.*, 586 F.3d 980, 989 (Fed. Cir. 2009) (citation modified); *Consol. Gas Supply Co. v. F.E.R.C.*, 745 F.2d 281, 291 (4th Cir. 1984) ("It is a reasonable interpretation device to conclude that what someone has not said, someone has not meant." (citing *Tex. E. Transmission Corp. v. F.P.C.*, 306 F.2d 345, 348 (5th Cir. 1962))).

In *Fahey v. Gledhill*, 663 P.2d 197, 200 (Cal. 1983), the court was tasked with determining whether, under maritime law, a red-letter clause in a ship repair contract was enforceable. The red-letter clause at issue "provided that defendant would 'not be liable for any loss of, or damage to said vessel, its contents or gear, or any loss of the use thereof from any cause whatsoever, excepting only willful misconduct on your part.' " *Id.* at 198.

The California Supreme Court explained that "although no specific words are necessary such as a direct reference to 'negligence,' the language of the agreement to exclude negligence liability must be clear and unequivocal and go beyond describing the scope of the loss and reflect the physical or legal responsibility." *Id.* at 204. The court held that although the red-letter clause "clearly and unequivocally describe[d] the scope of loss," it did "not clearly and unequivocally reflect the physical or legal responsibility." *Id.* The court noted that the red-letter clause applied to damages arising "'from any cause whatsoever,'" and these words "are unclear in that they may be read as describing the nature of the cause ... rather than the person chargeable with fault in bringing the loss." *Id.*

The phrase "any claim" in the second sentence of Clause 14 is also opaque when read in light of the agreement as whole. The broad indemnity in Clause 12 immunizes FDDA from any "negligent act or omission" that harms third-parties *or CJ II*. Clause 12 has absolutely no limiting principle. If CJ II is required to hold FDDA harmless for FDDA's negligence that harms CJ II under Clause 12, then it would be redundant for the "any claim" language or the bar on consequential damages in Clause 14 to encompass negligence. Indeed, this is the only explanation for why the indemnity clause expressly references negligence whereas Clause 14 does

not. Thus, Clause 14 "does not clearly and unequivocally exclude defendant's liability for negligence," and, therefore, is not enforceable. *Id.* at 204.

* * *

For the foregoing reasons, Clause 14 is unenforceable. Accordingly, CJ II is entitled to recover *all* of its proven damages, not just a mere refund.

## II. The district court erred in holding that Captain Nicholls could bind CJ II to Clause 14

Even if Clause 14 is enforceable, CJ II is still entitled to all of its damages because Captain Nicholls did not have actual authority to bind CJ II to Clause 14, nor did FDDA meet its burden[5] to show that he had apparent authority to do so.[6]

Apparent authority requires reasonable belief about the agent's authority, and there is no evidence Jakubas believed Nicholls was captain when he presented the

---

5 *Bogue Elec. Mfg. Co. v. Coconut Grove Bank*, 269 F.2d 1, 4 (5th Cir. 1959) ("The burden of proving agency is on the party asserting it"); *Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 73 (2d Cir. 2012) ("To recover against a principal on an apparent authority theory [under maritime law], it is crucial to prove the principal was responsible for the appearance of authority in the agent." (citation modified)).

6 In maritime agency disputes, courts "look to general principles of agency law." *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 226 (5th Cir. 1999). These may be found in various sources, including the Restatements of Agency. *Id.* Texas agency law may supplement the general principles, so long as it is "not inconsistent." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir. 1995); *see* ROA.1924. Where "the precedent in federal admiralty law is so thin," courts "should turn to state law more directly on point." *Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 246-47 (5th Cir. 2016) (quotation omitted).

SRO for his signature. Moreover, while Captain Nicholls may have had apparent authority to purchase *repairs* based on his status as the master of the vessel, it does not follow that this apparent authority extended *beyond* repairs. The district court's finding that Captain Nicholls had apparent authority to bind CJ II to Clause 14 because it is a "usual" and "standard" term in a maritime service repair contract is entirely unsupported in the record. ROA.2502-03.

### A. FDDA waived any argument Captain Nicholls had actual authority to agree to Clause 14

The district court held that Captain Nicholls did not have actual authority to bind CJ II to the additional terms, including Clause 14, based on "the Parties' stipulation" in the joint pretrial order, "and the Court's prior summary-judgment ruling." ROA.2499; *see* ROA.1924 (stipulating that "Captain Nicholls did not have actual authority to bind Plaintiff to the terms and conditions on the back of the May 29th SRO.").

Despite the stipulation, FDDA argued below that the issue of actual authority was ripe for consideration. ROA.2379, 2929. But "[i]t is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Branch-Hines v. Hebert*, 939 F.2d 1311, 1319 (5th Cir. 1991). The district court thus did not abuse its discretion in rejecting the argument. *See Excel Modular Scaffold & Leasing Co. v. OSHRC*, 943 F.3d 748, 755 (5th

Cir. 2019) ("Unless the court has abused its discretion, its rulings concerning the pretrial order will not be disturbed on appeal." (citation modified)).

### B. FDDA failed to establish it reasonably believed, at the relevant time, that the SRO was executed by the Yacht's captain

An agent has apparent authority to bind a principal only if the "third party reasonably believes the actor has authority to act on behalf of the principal *and* that belief is traceable to the principal's manifestations." ROA.2499-50 (quoting Restatement (Third) of Agency § 2.03). The district court found that FDDA met its burden to show that Jakubas reasonably believed on May 31, 2018, that he was presenting the SRO to someone with authority to act on CJ II's behalf, *i.e.*, the Yacht's captain. ROA.2501. This was clear error.

The district court found "Jakubas knew that Captain Nicholls was the Yacht's captain because they had previously met onboard at Fisher Island, where Jakubas had investigated the May 11, 2018, fuel filter issue." ROA.2465. The finding is supported by a single quotation from Captain Nicholls' deposition, where he testified he "had to arrange for technicians" to visit the island. ROA.5202. But nothing in the testimony indicates Jakubas *knew* that Captain Nicholls made the arrangements or that Jakubas would be able to identify Nicholls as the Yacht's captain. The passage merely shows that Captain Nicholls was aware that someone from FDDA would be visiting the Yacht to conduct repairs.

The district court's finding is not only unsupported, but also inconsistent. In the immediately preceding paragraph, the district court found that on May 31, 2018, "Jakubas asked Captain Nicholls if he worked 'for the vessel—or on the vessel,' and then asked [him] to sign" the May 29 SRO. ROA.2464. If Jakubas knew that Nicholls was the Yacht's captain on May 11, why would he have to ask Nicholls "if he worked 'for the vessel – or on the vessel' " a mere two weeks later? The answer is that Jakubas had no idea who Nicholls was, or his role on the Yacht. Although the district court found that that Nicholls "held himself out as" the Yacht's captain, it does not cite any supporting evidence. ROA.2500.

The district court placed hefty stock on Jakubas' testimony that Nicholls never told him that he lacked authority to sign the SRO. *See* ROA.2500. But Nicholls' silence is irrelevant because the law does not permit a third party to sit idly by and make assumptions about an agent's authority. The "duty to exercise reasonable care and diligence in order to ascertain whether the person ordering the supplies and services for the vessel has authority to do so is a burden which the law imposes upon suppliers and materialmen. Any other rule would encourage laxity in our admiralty laws[.]" *Findley v. Red Top Super Mkts.*, 188 F.2d 834, 836 (5th Cir. 1951).

"The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests

the duty to stop, look, and listen, and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358 (5th Cir. 2003) (citation modified). Jakubas did not heed the signal. He had no basis at the time to conclude that the person he handed the SRO had authority to bind CJ II. *Three Fifty Mkts., Ltd. v. Argos M M/V*, 166 F.4th 462, 475 (5th Cir. 2026) ("reliance must come from manifestations provided at the time of contracting").

Similarly, the district court improperly cut-and-paste FDDA's unsupported proposed factual finding that "[t]here were only two individuals on board the Yacht who were crew members," and then doubled-down by relying on this "fact" to support Jakubas' reasonable belief. ROA.2301, ROA.2500. Equally troubling is the district court's failure to factor that on June 30, 2020, FDDA's representative swore Waugh signed the May 29th SRO. ROA.58–59, 2485. At trial, FDDA offered no explanation for that testament. FDDA's initial belief that Waugh signed the SRO—a belief it held for years—is easily explained: Jakubas never told FDDA who signed the SRO because he had no idea who signed it, so FDDA assumed it was Waugh and only changed its opinion post-hoc.

In relying on insufficient evidence and inconsistent findings, the district court clearly erred in concluding that Jakubas "reasonably relied on Captain Nicholls's role

as the captain of the Yacht and that it was reasonable for FDDA to believe that he had the authority to sign the May 29th SRO." ROA.2501.

### C. FDDA failed to prove Nicholls had apparent authority to agree to Clause 14

If an agent has authority to enter a transaction, he may bind his principal to a contractual term if it "is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it." Restatement (Second) of Agency § 50. Based on this passage, and Captain Nicholls' apparent authority to purchase repairs for the Yacht, the district court found that Captain Nicholls had apparent authority to engage FDDA "in the usual manner, including executing a standard contract containing standard terms like a limitation-of-liability clause." ROA.2502-03. It was FDDA's burden to prove that Clause 14's limitation-of-liability terms are "usual" and "standard." FDDA failed to present any evidence that Clause 14 is "usual" or "standard" in any sense of the words.

#### 1. Review is *de novo* (but CJ II wins under any standard)

The operative general principle of agency law—one the district court referenced but then ignored in pertinent part—is that "[u]nless otherwise agreed" an agent authorized to enter a contract is required:

> (a) to make it in a usual form and with usual terms or, if there are no usual forms or terms, in an appropriate way; *and*



112742503

> (b) to do other acts incidental to its making which are usually done or which, if not usually done, are reasonably necessary for making it.

Restatement (Second) of Agency § 51 (emphasis added). The district court skipped section 51(a) entirely and found that section 51(b) permitted Captain Nicholls to agree to Clause 14, on the basis that its limitation of liability was incidental to his authority to contract with FDDA for repairs. ROA.2502-03.

Section 51(b) covers "acts incidental to [the contract's] making," not terms in the contract itself. Restatement (Second) of Agency § 51(b) & cmt. c.; *see id.* § 35 (explaining the contours of incidental authority). Clause 14 is not even an "incidental" term of the SRO. "'[I]ncidental' is something 'subordinate, nonessential, or attendant in position or significance ...: occurring merely by chance or without intention or calculation ... a minor concomitant.'" *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 713 (2007) (quoting Merriam Webster's Unabridged Dictionary; ellipses in original). For example, if a contract must be executed with a wet signature, and the principal has not provided a writing instrument, the agent's incidental authority includes the purchase of a pen to sign

the contract.[7] Clause 14 is a substantive clause in the SRO, not an act that is a minor concomitant to a repair.

Moreover, "when the term 'and' joins a list of conditions, it requires not one or the other, but *all* of the conditions." *United States v. Lopez*, 998 F.3d 431, 436 (9th Cir. 2021) (collecting authorities), *abrogated on other grounds by Pulsifer v. United States*, 601 U.S. 124 (2024); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116-20 (2012) (stating that "and" combines a list of conditions). Thus, sections 51(a) and 51(b) are distinct and *conjunctive* requirements.

The district court failed to apply correct legal principles in ignoring that whether Captain Nicholls had authority to bind CJ II to Clause 14 *also* turns on whether that term is "usual" within the meaning of section 51(a). FDDA offered no evidence that Clause 14 is a "usual" term, and the district court made no subsidiary findings to support such a conclusion. ROA.2502. Consequently, the district court's ultimate finding on the scope of apparent authority is subject to *de novo* review. *SCF Waxler Marine*, 24 F.4th at 470; *Eni US Operating*, 919 F.3d at 936; *see Hous. Expl.*

---

[7] *See* Tex. Bus. & Com. Code § 2.715(a) (defining "incidental damages" resulting from a seller's breach as including "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach").

*Co.*, 359 F.3d at 779 ("[F]actual findings made under an erroneous view of controlling legal principles are reviewed de novo.").

Accordingly, the Court owes the district court no deference. And on fresh review, Clause 14 clearly does not limit CJ II's damage recovery as Captain Nicholls had no apparent authority to bind CJ II to Clause 14.

### 2. FDDA failed to meet its burden to prove that Clause 14 is usual in the industry

When an agent has apparent authority to contract, the contract must be made "in a *usual* form and with *usual* terms or, if there are no *usual* forms or terms, in an appropriate way." Restatement (Second) of Agency § 51(a) (emphasis added). "Usual" typically means "customary," and "customary" means the established "practices within a community." *Customary*, *Usual*, Black's Law Dictionary (12th ed. 2024).[8]

[8] "Usual" has a secondary meaning of "[e]xpected based on previous experience, or on a pattern or course of conduct to date." *Usual*, Black's Law Dictionary (12th ed. 2024). The district court did *not* find that Clause 14 was a "usual" term for purposes of Captain Nicholls' apparent authority under Restatement (Second) of Agency § 51 based on the parties' course of dealing. Nor could it, as "course of dealing between the parties only becomes important when there is some disagreement over the scope of an actual authori[ty]," not apparent authority. *Old Sec. Life Ins. Co. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 740 F.2d 1384, 1391 (7th Cir. 1984). Indeed, a third party's course of dealing *with only an agent* cannot give rise to apparent authority, as apparent authority exists where a "third party reasonably believes the actor has authority to act on behalf of the principal and *that belief is traceable to the principal's manifestations*." Restatement (Third) of Agency § 2.03 (emphasis added). Because "an agent cannot create his own authority to represent a principal," it follows that the Yacht's crew could not create apparent authority

"Apparent authority is based on a [reasonable] third party's understanding of signals of all sorts concerning the actor with whom the third party interacts." Restatement (Third) of Agency § 2.03 cmt. d (2006). "The specific context in which a third party observes an agent is of course relevant to the reasonableness of the third party's belief." *Id.* "The customs or practices of a particular industry shape that context, as well as bearing upon the reasonableness of any belief that a particular agent has been authorized by the principal to do any particular act." *Id.* "Industry custom, moreover, defines the context in which a third party assesses the fit between the position in which the principal has placed an agent and the particular act." *Id.* Put another way, "absent knowledge on the part of third parties to the contrary, an agent has the apparent authority to do those things which are usual and proper to the conduct of the business which he is employed to conduct." *Three-Seventy Leasing Corp. v. Ampex Corp.*, 528 F.2d 993, 996 (5th Cir. 1976).

Despite carrying the burden to prove that Captain Nicholls had apparent authority to bind CJ II to Clause 14, FDDA put no evidence into the record from which any court could possibly determine whether clauses like Clause 14 are industry-standard or customary in the yacht servicing industry. At most, the

to bind CJ II through contracting with FDDA. *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*,39 F.4th 263, 275 (4th Cir. 2022) (quotation omitted).

evidence shows that the SRO was FDDA's standard form and that Clause 14 is a standard term in FDDA's contracts. But whether a clause is standard in a defendant's particular adhesion contract says nothing about whether it is standard in the *industry*.

The only evidence is that Clause 14 is *not* industry standard. The record includes a number of invoices for post-incident repairs to restore the Yacht from the damages FDDA's negligence caused. ROA.4964-5003, 5004-26, 5043, 5061-63, 5064-66, 5067, 5068-75, 5089–90[9], 5091-94, 5126-29, 5153. The uncontroverted finding of CJ II's Chief Financial Officer is that "the terms and conditions on the back of the SRO [are] uncommon for work orders in comparison to dozens and dozens of other work orders and invoices he has reviewed in this matter." ROA.2486. Indeed, only two servicers (other than FDDA) included limitation of liability clauses in their invoices, and neither clause contains anything like Clause 14's broad protections for the servicers.

An invoice from RPM Diesel Engine Company, Inc., for approximately $17,000 in repairs to the Yacht's backup generator, states that RPM "is not responsible for loss or damage to boats or articles left in boats in case of fire, theft or any other cause beyond our control." ROA.5004. The RPM invoice thus does not

[9] This invoice includes venue and attorney's fee clauses, but no limitation of liability. ROA.5090.

limit liability for causes *within* RPM's control. An invoice from LUU Marine & Associates, Inc., for approximately $14,000 in painting repairs, limits LUU's liability to $100,000. ROA.5127-29. The invoice also includes a clause stating that LUU has accepted the boat for repairs "on the express representation of the person signing, that he is lawfully authorized to repair the same, bind the vessel for payment, and has read and fully understands this agreement." ROA.5129.

To the extent industry standards can be gleaned from case law, the red-letter clauses the Fifth Circuit has previously addressed limit liability to $300,000, not a mere refund of the purchase price. *Alcoa*, 383 F.2d at 55; *Todd Shipyards*, 674 F.2d at 409 n.2; *Coastal Iron Works*, 783 F.2d at 581; *Frota Oceanica Brasileira S.A. v. M/V Alice St. Philip*, 790 F.2d 412, 416-17 (5th Cir. 1986).

FDDA's complete lack of industry evidence in its favor explains (but does not excuse) why the district court failed to make subsidiary findings on industry standards before concluding that the SRO was "a standard contract" and Clause 14 was a "standard term[]." ROA.2502-03. Without these necessary subsidiary findings, the district court had no basis to conclude that FDDA met its burden of proof that Clause 14 is an industry standard term. As a result, FDDA's apparent authority argument is dead in the water.

### 3. *Coastal Iron Works* does not control

*Coastal Iron Works* is the elephant in the room. Both FDDA and the district court relied heavily on it for the proposition that Captain Nicholls had apparent authority to bind CJ II to the additional terms, including Clause 14. *See* ROA.2421-24, 2501-03. However, *Coastal Iron Works* is irrelevant to this dispute for an array of reasons.

In *Coastal Iron Works*, the district court found that a shipyard and shipowner both failed to use reasonable care to prevent a fire on a vessel, and assessed 75% liability against the shipyard and 25% against the shipowner. 783 F.2d at 580. "Although damages were approximately $1,600,000," the district court found the shipyard was liable to the shipowner "only to the extent of the $300,000 contractual limit" in the red-letter clause of the ship repair contract the ship's captain had signed when he brought the vessel to the shipyard. *Id.* at 580-81.

On appeal, the Court rejected the argument that the captain did not have authority to agree to the red-letter clause in a single paragraph:

> [T]he [vessel's] captain acted within the scope of his authority in signing the repair contract containing the red letter clause. A ship's captain is master of his vessel in every sense of the word. He has broad authority and responsibility in the ship's successful operation. He has implied authority to enter into agreements to ensure proper care for the ship and its crew. *Cox v. Esso Shipping*

> *Co.*, 247 F.2d 629, 633 (5th Cir. 1957). We, therefore, hold [the shipowner] bound by [the captain's] action.

*Id.* at 582. The reliance on *Cox* is odd, as the appeal in that case "present[ed] primarily procedural errors in the exclusion of evidence and in instructions of the Court to the jury" regarding the "the unique circumstances under which a seaman works and is compelled under punitive sanctions to obey orders." 247 F.2d at 631, 635. Further, *Cox* did not involve ship repairs or a red-letter clause.

Regardless, *Coastal Iron Works* concerns "*implied authority* to enter into agreements to ensure proper care for the ship and its crew." 783 F.2d at 582 (emphasis added). It is an elementary principle of agency law that implied authority is a subset of *actual* authority, *not* apparent authority. Restatement (Second) of Agency § 7 (stating that express authority and implied authority, are within the ambit of actual authority, and "are to be distinguished sharply from 'apparent'" authority); Restatement (Third) of Agency § 2.01 cmt. d (explaining that implied authority "falls within the definition of actual authority"). Similarly, *Cox* apparently involved a question of actual authority rather than apparent authority. 247 F.2d at 633.

Under maritime law, the Court has recognized that the distinction between actual authority and apparent authority is important. *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985) ("Apparent authority is distinguished from actual authority because it is the manifestation of the principal to the third

person rather than to the agent that is controlling."). A captain's implied authority to enter agreements to ensure care for a ship and its crew says nothing about whether a captain has apparent authority to agree to a limitation of liability clause like Clause 14. Because actual authority is not at issue here, *Coastal Iron Works* has no bearing on this case.[10]

* * *

Accordingly, Captain Nicholls lacked authority to bind CJ II to Clause 14, and so it does not bar CJ II's full recovery. The district court's contrary conclusion must be reversed.

## III. Even if Clause 14 is enforceable under maritime law, CJ II is still entitled to full recovery

Assuming *arguendo* that Clause 14 is binding, CJ II is nonetheless entitled to recover all of its damages for FDDA's negligence because Clause 14 does not expressly limit liability for negligence as Texas law requires.

The district court applied maritime law to determine whether Clause 14 was agreed to and enforceable. ROA.2503-04. When the district court answered these questions in the affirmative, it triggered the SRO's choice-of-law provision, under

---

[10] The *Coastal Iron Works* clause (unlike Clause 14) provided adequate deterrence because its $300,000 limit represented 25% of the damages for which the shipyard was responsible.

which Texas laws "govern all matters arising of or relating to [the SRO]." ROA.6017; *see Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 76-77 (2024) (choice of law provisions in maritime contracts are "presumptively enforceable"). Hence, the district court applied Texas law to determine that the economic loss rule does not bar CJ II's negligence action, and to determine if CJ II's damages are limited by Clause 14. ROA.2050 & n.4, 2506.

That is, while the threshold *enforceability* of the SRO is a question of maritime law, its *interpretation* is a question of Texas law. *See Alan, Sean & Koule, Inc. v. SV/CORSTA V*, 286 F. Supp. 2d 1367, 1376-79 (S.D. Ga. 2003) (applying maritime law to determine whether a red-letter clause in a ship repair contract was enforceable and then applying state law to interpret the clause). One such canon of interpretation is the express negligence rule. *DDD Energy, Inc. v. Veritas DGC Land, Inc.*, 60 S.W.3d 880, 883 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("The express negligence requirement is not an affirmative defense, but a rule of contract interpretation which is determinable as a matter of law.").

In Texas, "risk-shifting contractual agreement[s]" like Clause 14 are "narrowly construed." *Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 332-33 (Tex. App.—Houston [14th Dist.] 2006, no pet.). The express negligence rule "require[es] the parties to actually include the word 'negligence' or some synonym thereof" in the

risk-shifting clause. *Lee Lewis Constr., Inc. v. Harrison*, 64 S.W.3d 1, 21 n.13 (Tex. App.—Amarillo 1999), *aff'd*, 70 S.W.3d 778 (Tex. 2001); *see Rosewood Props. Co., Inc. v. Mary Hill and Gary C. Smith, Pro. Corp.*, No. 05-91-00590-CV, 1992 WL 178599, at *6 (Tex. App.—Dallas July 28, 1992, writ denied) ("Indemnity provisions which do not mention the word 'negligence' or specify the extent of coverage are generally held unenforceable.").

Clause 14 does not use the term "negligence" nor does it "refer to a negligence cause of action by other words." *Blankenship v. Spectra Energy Corp.*, No. 13-12-00546-CV, 2013 WL 4334306, at *4 (Tex. App.—Corpus Christi Aug. 15, 2013, no pet.). The omission is striking given that Clause 12 expressly requires indemnification for "negligence" and losses arising from a "tort" or other "negligent act or omission." The failure to include similar language in Clause 14 shows an absence of intent to limit FDDA's liability for its own negligence. *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 (Tex. 2021) ("[U]sing different language in different parts of a contract means the parties intended different things.").

Because Clause 14 does not refer to "negligence" or some synonym thereof, it does not satisfy the express negligence rule and thus cannot bar CJ II's recovery. *Safeway, Inc. v. PDX, Inc.*, 676 F. App'x 229, 231-36 (5th Cir. 2017) (holding that

exculpatory clause requiring plaintiff to "waive[] any claims against" defendant and limiting defendant's liability "from any and all loss, damage, or expense (or claims of damage or liability)" failed express negligence test).

* * *

Clause 14 does not limit FDDA's liability because it is unenforceable under maritime law; because Captain Nicholls did not have authority to bind CJ II to its terms; and because it fails Texas' express negligence test. Thus, CJ II is entitled to all its damages.

## IV. The district court erred in denying CJ II lost charter damages

The district court correctly found that CJ II proved its direct and loss of personal use damages. However, the district court erred in finding that CJ II did not also prove its loss of charter damages.

CJ II's argument is that it is entitled to damages for loss of charter revenue because, but for the sea-spray incident, it would have chartered the Yacht. ROA.2425-26. CJ II bore the burden to show, with reasonable certainty, that (1) there was a market for the charter; (2) the Yacht was capable of being chartered; and (3) CJ II would have chartered the yacht given the opportunity to do so. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000).

At trial, CJ II proved that the Skylar, the Yacht's twin-sister vessel, was regularly chartered through Burgess; that Skolnick and Burgess were working together on chartering the Yacht, including ongoing communications that reflected a promising charter market for the Yacht; that Burgess had suggested some "toys" for charter and Skolnick had purchased several of them already, including a tender and jet ski, and was "looking to purchase other[s]"; and Skolnick would have executed a charter agreement with Burgess the "next day" after the August 24th sea trial had it not been for the FDDA-caused sea-spray event that flooded the Yacht's engine room. ROA.2449-50, 2452, 2494.

Nonetheless, the district court concluded CJ II "failed to establish any basis for loss of charter hire." ROA.2508. Unlike the district court's "standard terms" finding, it made some subsidiary findings in support of this conclusion:

> 1. "[T]here was never a signed agency agreement between Burgess and Plaintiff or Skolnick to permit the marketing of the vessel for charter to third parties."
>
> 2. "There is no evidence in the record to suggest that Plaintiff ever had any expectation or intention to charter the Yacht because Skolnick did not attempt to charter the Yacht during the high season for the Bahamas during the period of December 2017–April 2018."

3. "During the period of time that the Yacht was owned by [CJ II], the vessel was never chartered out to any third party."[11]

4. "The Yacht could not be chartered to a third party for hire because it lacked the necessary safety equipment, the proper classification, and the proper insurances, and there was no evidence of any ready, able, or willing charterers presented."[12]

5. "[T]he Yacht was never functional and never chartered from its delivery in 2017 through the August 24, 2018, sea-spray event."

ROA.2508. Several of these key subsidiary findings are internally inconsistent, and "internally inconsistent findings constitute clear error." *John Allan Co.*, 540 F.3d at 1139; *Aponte v. Calderon*, 284 F.3d 184, 194 (1st Cir. 2002) ("[F]actual findings which are internally inconsistent are clearly erroneous").

Consider the finding that CJ II never had any "intention to charter" the Yacht "because Skolnick did not attempt" to do so "during the period of December 2017–April 2018." Juxtapose this with the finding that "the Yacht was never functional" "from its delivery in 2017 through the August 24, 2018, sea-spray event." *Of course*

---

[11] The test is not whether the Yacht was actually chartered—rather, it is whether the Yacht was *capable* of being chartered. *See The Conqueror*, 166 U.S. 110, 133 (1897) (In all the cases in which we have allowed demurrage, the vessel has been engaged, *or was capable of being engaged*, in a profitable commerce, and the amount allowed was determined either by the charter value of such vessel or by her actual earnings at about the time of the collision." (emphasis added)).

[12] The district court did not cite any record evidence to support this finding. ROA.2508.

Skolnick did not sign the Burgess charter agreement while the Yacht was undergoing repairs and not yet ready for charter delivery.

The "intention to charter" finding is inconsistent because it ignores that Skolnick was in the process of getting the Yacht *functional so that Burgess could charter it*, and CJ II would "100 percent" have done so in August 2018 if not for the sea-spray incident caused by FDDA's negligence during that process. ROA.2812 ("Q. Were you going to charter this vessel? A. 100 percent, yes. Q. Were you talking to Burgess about chartering the vessel? A. Yes. Q. Why did you wait so long? A. As I stated, I wanted the boat to be 100 percent."). The very point of the sea trial during which the incident occurred was to ensure the Yacht's functionality so that it could be chartered. ROA.2813 ("Q. If your engine room had not flooded on August 24, 2018, could you have signed that charter agreement the very next day? A. Absolutely. Q. Would you have done that? A. 100 percent, yes.")

Similarly, although Burgess submitted a signed charter agreement ready for Skolnick's signature, he did not sign the agreement and purchase insurance and additional equipment for charter, because the Yacht was not yet "100 percent." ROA.2812-13. Taking such actions would have been unnecessary and a waste of time and money. ROA.2493, 3000-01. Nobody sensible buys insurance for a car that isn't

yet road ready. That doesn't mean that when the owner hires a mechanic to fix the car he doesn't intend to make full use of it afterwards.

The uncontroverted evidence is that there was a ready market for chartering the Yacht through Burgess given the successful charter of the Yacht's twin-sister vessel, and that CJ II could have and would have chartered the Yacht after August 2018 but for FDDA's negligence, which left the Yacht nonfunctional for years. ROA.2813. Thus, the district court clearly erred in issuing inconsistent findings to CJ II's detriment, and remand is appropriate for it to issue consistent findings. *See Canal Barge*, 220 F.3d at 379.

## CONCLUSION

The Court should reverse the district court's finding that Clause 14 limits CJ II's recovery, vacate the district court's finding on loss of charter damages, and remand for further proceedings on that issue.

Dated: March 13, 2026

Respectfully submitted,

*s/ John B. Shely*

John B. Shely
Brian C. Pidcock
Cameron Pope
Chaim Mindick
HICKS THOMAS LLP
700 Louisiana Street, Ste. 2300
Houston, Texas 77002
(713) 547-9140
jshely@hicks-thomas.com
bpidcock@hicks-thomas.com
cpope@hicks-thomas.com
kmindick@hicks-thomas.com

*Counsel for Plaintiff-Appellant/ Cross-Appellee*

**CERTIFICATE OF SERVICE**

I certify that on March 13, 2026, I electronically transmitted this document to the Clerk of the Court of the 5th Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept such Notice as service of this document by electronic means.

*s/ John B. Shely*
John B. Shely

## CERTIFICATE OF COMPLIANCE

1. This document complies with the 12,991 word type-volume limit, because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and by Circuit Rule 32.1, this document contains 13,000 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32.1 and with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity A font.

*s/ John B. Shely*
John B. Shely

## ECF CERTIFICATION

I hereby certify that (i) this document complies with the privacy redaction requirement of FED. R. APP. P. 25(a)(5) and 5TH CIR. R. 25.2.13 and that any required privacy redactions have been made; (ii) the electronic submission is an exact copy of the paper document pursuant to 5TH CIR. R. 25.2.1; (iii) the document has been scanned for viruses using the most recent version of Sentinel One and is free of viruses, in compliance with 5TH CIR. ECF Filing Standard A(6); and (iv) the document will be maintained in paper form for three years after the mandate or order closing the case issues, per 5TH CIR. R. 25.2.9 and 5TH CIR. ECF Filing Standards E(2).

*s/ John B. Shely*
John B. Shely