# In the United States Court of Appeals for the Fifth Circuit

**No. 25-20437**

CONSTANCE JOY II, L.L.C.,
A DELAWARE LIMITED LIABILITY CO.,

*Plaintiff – Appellant/Cross-Appellee*,

*v.*

STEWART & STEVENSON FDDA, L.L.C.,
A DELAWARE LIMITED LIABILITY COMPANY,
DOING BUSINESS AS FLORIDA DETROIT DIESEL-ALLISON,

*Defendant – Appellee/Cross-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

**BRIEF OF APPELLEE/CROSS-APPELLANT, STEWART & STEVENSON FDDA, L.L.C., DOING BUSINESS AS FLORIDA DETROIT DIESEL-ALLISON**

Kenneth G. Engerrand
Lead Attorney
State Bar No. 06619500
BROWN SIMS, P.C.
1990 Post Oak Blvd., Suite 1800
Houston, Texas 77056
713.629-1580

George M. Chalos
State Bar No. 24077854
CHALOS & CO., P.C.
7210 Tickner Street
Houston, Texas 77055
713.574-9582

*Attorneys for Defendant-Appellee/Cross-Appellant, Stewart & Stevenson FDDA, L.L.C. Doing Business As Florida Detroit Diesel-Allison*

# In the United States Court of Appeals for the Fifth Circuit

**No. 25-20437**

CONSTANCE JOY II, L.L.C.,
A DELAWARE LIMITED LIABILITY CO.,

*Plaintiff – Appellant/Cross-Appellee*,

*v.*

STEWART & STEVENSON FDDA, L.L.C.,
A DELAWARE LIMITED LIABILITY COMPANY,
DOING BUSINESS AS FLORIDA DETROIT DIESEL-ALLISON,

*Defendant – Appellee/Cross-Appellant.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellant/Cross-Appellee: Constance Joy II, L.L.C.

2. Barry Skolnick is the Sole Member of Constance Joy II, L.L.C. Constance Joy II, L.L.C., is the parent company of Constance Joy II, Ltd., owner of the vessel CONSTANCE JOY.

3. Counsel for Plaintiff-Appellant/Cross-Appellee: Constance Joy II, L.L.C.:

John B. Shely
Brian C. Pidcock
Cameron Pope
HICKS THOMAS LLP
700 Louisiana St., Suite 2300
Houston, Texas 77002

4. Defendant-Appellee/Cross-Appellant: Stewart & Stevenson FDDA, L.L.C., d/b/a Florida Detroit Diesel-Allison

5. Kirby Corp. is the parent company of Stewart & Stevenson FDDA, L.L.C., d/b/a Florida Detroit Diesel-Allison

6. Insurers for Defendant-Appellee/Cross-Appellant, Stewart & Stevenson FDDA, L.L.C., d/b/a Florida Detroit Diesel-Allison: Markel, Continental-Fidelis, and Allianz.

7. Counsel for Defendant-Appellee/Cross-Appellant Stewart & Stevenson FDDA, L.L.C. d/b/a Florida Detroit Diesel-Allison:

Kenneth G. Engerrand
BROWN SIMS, P.C.
1990 Post Oak Blvd., Suite 1800
Houston, Texas 77056

George M. Chalos
CHALOS & CO., P.C.
7210 Tickner Street
Houston, Texas 77055

Respectfully submitted,

*/s/Kenneth G. Engerrand*
Kenneth G. Engerrand
*Lead Attorney for*
*Defendant-Appellee/Cross-Appellant,*
*Stewart & Stevenson FDDA, L.L.C.*
*d/b/a Florida Detroit Diesel-Allison*

## STATEMENT REGARDING ORAL ARGUMENT

This case involves damage in the engine room of a 125-foot luxury yacht during a sea trial after a contractor performed work on the yacht's engines. The litigation between the yacht owner and ship repairer involved questions with respect to liability and limitations on damages. The district judge ultimately resolved the case with comprehensive findings of fact and conclusions of law (69 pages) after a three-day bench trial with numerous witnesses and more than 2,500 pages of exhibits.

The resolution of the fact disputes by the district judge led to inescapable legal conclusions that are supported by long-standing principles and precedents. Although Constance Joy II, L.L.C.[1] now seeks to convert a dispute over the authority of the vessel's captain into a vehicle to address "an unsettled question" on the effect of gross negligence on maritime-risk allocation, that was not the issue presented to the district court, and it is not properly before this court.[2] Instead, this appeal challenges the judge's findings on disputed issues and the inexorable conclusions from those

[1] For ease of the Court, this Brief will refer to the parties as CJ II and FDDA—the shortened form used by Appellant/Cross-Appellee, Constance Joy II, L.L.C.

[2] Just as Chief Judge Elrod noted (in the case cited by CJ II) that "this is not the case to address this important question of maritime law," *ENSCO Offshore, L.L.C. v. Cantium, L.L.C.*, No. 24-30508, 2025 U.S. App. LEXIS 32480, at *7 (5th Cir. Dec. 11, 2025) (Elrod, C.J., concurring), so too the current appeal does not provide the opportunity to address an issue that was not presented in the district court and would not be relevant to this appeal even if it were.

findings. The issues presented by CJ II to the district court that are necessary to resolve this appeal have been thoroughly briefed and authoritatively and properly decided. Therefore, FDDA respectively submits that oral argument is unnecessary to assist the Court.

# TABLE OF CONTENTS

**Page/s**

CERTIFICATE OF INTERESTED PERSONS....................i

STATEMENT REGARDING ORAL ARGUMENT....................iv

TABLE OF CONTENTS....................vi

TABLE OF AUTHORITIES....................viii

STATEMENT OF JURISDICTION....................1

STATEMENT OF ISSUES PRESENTED....................1

STATEMENT OF THE CASE....................2

A. Purchase of the Yacht....................2

B. Damage to the Yacht....................3

C. Procedural History....................8

SUMMARY OF ARGUMENT....................11

ARGUMENT....................13

I. STANDARD OF REVIEW FOR THE APPEAL AND CROSS APPEAL....................13

II. INTRODUCTION....................14

III. CJ II'S CHALLENGES TO THE LIMITATION CLAUSE IN THE SRO....................15

A. Gross Negligence Was Not, and Is Not, an Issue with Respect to the Enforceability of the Limitations....................16

B. The SRO Validly Limited FDDA's Liability for Damages Caused by Ordinary Negligence....................23

C. The Limitation Need Not Deter Negligence....................26

**TABLE OF CONTENTS -- *Continued***

**Page/s**

D. The District Judge Correctly Found that the Limitation Adequately Deters Negligence....29

E. The District Judge Correctly Found that the Parties Had Equal Bargaining Strength and that FDDA Did Not Exert Superior Power....32

F. The District Judge Correctly Concluded that the SRO Clearly and Unequivocally Limited CJ II's Recovery for Negligence....36

G. The District Judge Correctly Held that the Captain of the Yacht Bound the Owner to the Terms of the Repair Contract....38

H. The Limitation is Enforceable under Texas Law....44

IV. THE DISTRICT JUDGE CORRECTLY FOUND THAT CJ II FAILED TO ESTABLISH ANY BASIS FOR RECOVERY OF CHARTER HIRE....46

V. CROSS-APPEAL....49

A. CJ II Is Not Entitled to Recover Loss of Personal Use....50

B. CJ II Failed to Establish a Claim for Loss of Personal Use of the CONSTANCE JOY....52

CONCLUSION....54

CERTIFICATE OF SERVICE....56

CERTIFICATE OF COMPLIANCE....57

# TABLE OF AUTHORITIES

**CASES:** **PAGE/S**

*The BALSA*,
10 F.2d 408 (3d Cir. 1926)....................................................................39

*BASF Wyandotte Corp. v. The Tug Leander, Jr.*,
590 F.2d 96 (5th Cir. 1979)....................................................................28

*Bisso v. Inland Waterways Corp.*,
349 U.S. 85 (1955)....................................................................27,28

*Broadley v. Mashpee Neck Marina, Inc.*,
471 F.3d 272 (1st Cir. 2006)....................................................................24,37

*Brooklyn E. Dist. Terminal v. United States*,
287 U.S. 170 (1932)....................................................................51,52

*Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*,
206 F.3d 1373 (11th Cir. 2000)....................................................................50,51

*Coastal Iron Works, Inc. v. Petty Ray Geophysical*,
783 F.2d 577 (5th Cir. 1986).......19,20,22,23,24,25,26,30,37,38,39,44

*The CONQUEROR*,
166 U.S. 110 (1897)....................................................................47,48,50,51,52,53

*Corbitt v. Diamond M. Drilling Co.*,
654 F.2d 329 (5th Cir. 1981)....................................................................45

*Diesel "Repower", Inc. v. Islander Invs., Ltd.*,
271 F.3d 1318 (11th Cir. 2001)....................................................................31

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*,
476 U.S. 858 (1986)....................................................................34

*Edward Leasing Corp. v. Uhlig & Assocs., Inc.*,
785 F.2d 877 (11th Cir. 1986)....................................................................37

**TABLE OF AUTHORITIES—*CONTINUED***

**CASES:** **PAGE/S**

*ENSCO Offshore, L.L.C. v. Cantium, L.L.C.*,
No. 24-30508, 2025 U.S. App. LEXIS 32480
(5th Cir. Dec. 11, 2025)....................iv,17,18,29,30

*Epstein v. Corporation Peruna de Vapores*,
325 F. Supp. 535 (S.D.N.Y. 1971)....................41

*Ethyl Corp. v Daniel Constr. Co.*,
725 S.W.2d 705 (Tex. 1987)....................45

*Farina v. Mt. Bachelor, Inc.*,
66 F.3d 233 (9th Cir. 1995)....................23,24

*Ferromet Res., Inc. v. Chemoil Corp.*,
5 F.3d 902 (5th Cir. 1993)....................39

*Finkel v. Challenger Marine Corp.*,
316 F. Supp. 549 (S.D. Fla. 1970)....................51,52

*Head v. U.S. Inspect DFW, Inc.*,
159 S.W.3d 731 (Tex. App.—Ft. Worth 2005,
no pet.)....................46

*La Esperanza de P.R., Inc. v. Perez y Cia. de P.R.*,
124 F.3d 10 (1st Cir. 1997)....................20,21,22

*Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*,
199 F.3d 220 (5th Cir. 1999)....................39

*In re Larry Doiron, Inc.*,
879 F.3d 568 (5th Cir. 2018) (en banc)....................28

*Lirette v. Popich Bros. Water Transp., Inc.*,
699 F.2d 725 (5th Cir. 1983)....................29

**TABLE OF AUTHORITIES—*CONTINUED***

**CASES:** **PAGE/S**

*Luwisch v. Am. Marine Corp.*,
956 F.3d 320 (5th Cir. 2020)....................13,14

*Marine Diesel Specialists, Inc. v. MY "BG3"*,
2020 AMC 21, 2020 U.S. Dist. LEXIS 10001
(S.D. Fla. Jan 17, 2020)....................32

*M/V American Queen v. San Diego Marine Constr. Corp.*,
708 F.2d 1483 (9th Cir. 1983)....................30,31,35

*Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*,
604 F.3d 221 (5th Cir. 2010)....................16,23,26,45

*One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*,
648 F.3d 258 (5th Cir. 2011)....................13,16

*Oppen v. Aetna Inc. Co.*,
485 F.2d 252 (9th Cir. 1973)....................50,51,52

*Ove Skou v. United States*,
478 F.2d 343 (5th Cir. 1973)....................47

*Royal Ins. Co. of Am. v. S.W. Marine*,
194 F.3d 1009 (9th Cir. 1999)....................20,21,35

*Rybovich Boat Co. v. M/Y Blue Star*,
546 F. Supp.3d 1270 (S.D. Fla. 2021)....................41

*Sander v. Alexander Richardson Invs.*,
334 F.3d 712 (8th Cir. 2003)....................20,21,22,35,36

*The SCHOONER FREEMAN v. Buckingham*,
59 U.S. (18 How.) 182 (1856)....................41

## TABLE OF AUTHORITIES—*CONTINUED*

**CASES:** **PAGE/S**

*Shackleford v. Sailor's Wharf, Inc.*,
2017 AMC 482, 2016 U.S. Dist. LEXIS 106177
(M.D. Fla. Aug. 11, 2016)....48

*S.W. Bell Tel. Co. v. FDP Corp.*,
811 S.W.2d 572 (Tex. 1991)....45,46

*Snavely v. Lang*,
592 F.2d 296 (6th Cir. 1979)....50,51

*Theriot v. Bay Drilling Corp.*,
783 F.2d 527 (5th Cir. 1986)....28

*Thomas v. Atl. Coast Line R.R.*,
201 F.2d 167 (5th Cir. 1953)....23

*Thomson v. United States*,
266 F.2d 852 (4th Cir. 1959)....52

*Todd Shipyards Corp. v. Turbine Serv., Inc.*,
674 F.2d 401 (5th Cir. 1982)....17,18,19,20,22,23,24,25,26,30,36,37

*Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*,
895 F.2d 1043 (5th Cir. 1990)....28

*United Geophysical Co. v. Vela*,
231 F.2d 816 (5th Cir. 1956)....39

**OTHER MATERIALS:**

Restatement (Second) of Agency § 35....42,43

Restatement (Second) of Agency § 50....42,43

## TABLE OF AUTHORITIES—*CONTINUED*

**OTHER MATERIALS:** **PAGE/S**

Restatement (Second) of Agency § 51 ....................................................42,43

1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5:16 (7th ed. Nov. 2025 update) ..............................................29,30

## STATEMENT OF JURISDICTION

The parties agree that the district court had admiralty jurisdiction over CJ II's maritime negligence claim under 28 U.S.C. § 1333(1), and this Court has jurisdiction, pursuant to 28 U.S.C. § 1291, over the appeal and cross appeal from the Final Judgment of the district court. ROA.2512; R.E. Tab 5.[3]

## STATEMENT OF ISSUES PRESENTED[4]

1. Whether the district judge properly concluded that the limitations on damages in the Service Repair Order ("SRO") for FDDA's work on the CONSTANCE JOY are enforceable under the general maritime law?

2. Whether the district judge properly found that the Captain of the CONSTANCE JOY had authority to enter into the SRO for the work on the vessel with the limitations on damages in the SRO?

3. Whether the limitations on damages in the SRO are enforceable under Texas law?

4. Whether the district court correctly found that CJ II failed to establish its claim for loss of charter hire?

5. Cross-Appeal: Whether CJ II is entitled to recover for loss of personal use of the CONSTANCE JOY?

---

[3] As CJ II did not file Record Excerpts, FDDA refers to the Record Excerpts it filed as R.E. Tab ___.

[4] As discussed herein, several issues addressed by CJ II on appeal were not presented to the district judge. FDDA objects to CJ II's assertion of these issues but will respond to them and lists them in the Statement of Issues.

## STATEMENT OF THE CASE

### A. Purchase of the Yacht

Barry Skolnick, a resident of Florida, ROA.2950, and ultimate beneficial owner of the luxury yacht involved in this case, has been "quite successful," ROA.2951, buying and developing properties and in other business ventures. He previously owned several yachts, 33-feet, 42-feet, and 80-feet, ROA.2953, before contracting with Italian yacht builder Azimut-Benetti SpA on August 29, 2014, to build the 125-foot CONSTANCE JOY for the sum of $15,350,000. ROA.2956. It took about three years to build the yacht, ROA.2960, and the Yacht Construction Contract contained a limitation of the builder's liability. ROA.3781.

Skolnick created a corporate structure to own and manage the yacht. ROA.2737. This structuring included forming Constance Joy II Limited as a Marshall Islands company, ROA.3808, ROA.2965, to take title to the yacht. ROA.3809; ROA.3814. The Marshall Islands company registered and flagged the yacht in Jamaica. ROA.3814, and it was classed as a pleasure yacht. ROA.3804.

Skolnick formed another company, the Appellant herein, CJ II, as the sole shareholder of Constance Joy II Limited. ROA.3815. CJ II is a Delaware L.L.C., ROA.3805, and Skolnick is the sole member. ROA.2963. Skolnick

explained that the corporate structure was: "Just to reduce, I guess, personal exposure." ROA.2963. Skolnick's cousin, Aaron Fischer, ROA.2736, was the CFO and manager for CJ II, ROA.2911, and served as Skolnick's interface with the crew. ROA.2979.

### B. Damage to the Yacht

Skolnick took delivery of the yacht in Italy in 2017, ROA.2966, and the yacht had its maiden voyage in the Mediterranean. ROA.2969. The yacht returned to the shipyard for a month or two to complete the punch list of repairs, ROA.2748, ROA.2971, and it was then transported on a barge to Florida in December 2017. ROA.2973.

In February 2018, Constance Joy II Limited, as owner of the CONSTANCE JOY, entered into a Standard Crew Management Agreement with Burgess Crew Services (signed by Skolnick) by which Burgess agreed to provide a suitable crew to operate and maintain the yacht. ROA.3838. The Agreement contains provisions for allocation of risk, as the owner is required to provide insurance and name Burgess as an insured, ROA.3843, ROA.3845. The Agreement also limits the liability of Burgess and provides for the owner to indemnify Burgess. ROA.3850. In March 2018, Constance Joy II Limited entered into a Yacht Management Agreement with Nigel Burgess Limited (signed by Skolnick) for Burgess to act as manager of the

yacht. ROA.3856. As with the Crew Management Agreement, the Yacht Management Agreement contains provisions for allocation of risk, including naming Burgess as an insured on the owner's insurance, ROA.3863, indemnifying Burgess, ROA.3867, and limiting the liability of Burgess. ROA.3866.

Burgess was interested in more than managing the yacht and providing the crew. It was also "very anxious" to get the CONSTANCE JOY under contract to include in its fleet of yachts to charter. ROA.2979. The company sent several requests and drafts of a proposed Yacht Charter Agreement to Skolnick or his CFO, Aaron Fischer, offering to market and manage the chartering of the CONSTANCE JOY and discussing details of the chartering, but neither Skolnick nor Fischer ever signed an agreement to permit Burgess to market or charter the CONSTANCE JOY. ROA.4266, ROA.4274, ROA.4275, ROA.4300, ROA.4305, ROA.4307, ROA.4317, ROA.4330, ROA.4335, ROA.4348, ROA.4350.

Pursuant to the Crew Management Agreement, Burgess entered into Employment Agreements in March 2018 with Anthony Nicholls to serve as captain of the CONSTANCE JOY, ROA.3816, and Anthony Waugh to serve as Engineer. ROA.3827. Each employment agreement contained Section 14.14, titled "Authority," stating that the Captain/Engineer "shall not have

any right or power to bind the Employer, any agent or owner, to any engagement, obligation or contract . . . ." ROA.3825, ROA.3836. However, Captain Nicholls requested a letter from Burgess confirming his authority as captain so that "I can partake in my duties as captain and master of the vessel." ROA.5179 (p.95). Burgess issued the letter and confirmed that Captain Nicholls would be "assuming full responsibility as Master for the operation of the motor yacht CONSTANCE JOY" and "Captain Nicholls has the overriding authority to make any and all decisions with regard to the safety of the Yacht, its crew and the protection of the environment." ROA.6018 (R.E. Tab. 12). Captain Nicholls was given a credit card that he was "authorized to use as captain." ROA.5201 (p.182).

The engines on the CONSTANCE JOY began to experience temperature control problems in April 2018. ROA.1915 (Admission 14). Engineer Waugh called FDDA to the yacht on April 24, 2018 to service the port engine because it was losing prime. ROA.5316 (p.66). FDDA is the exclusive service company in South Florida for the yacht's engines. ROA.3045-ROA.3046. To authorize the service, FDDA presented Waugh with a Service Repair Order ("SRO"), ROA.6019 (R.E. Tab 11), on April 24, 2018, and he signed the SRO after reading it. ROA.5316 (p.68). He separately wrote his initials in the box on the first page stating: "Hereby Accepting the

Additional Terms of Sale Included Herein." ROA.6019 (R.E. Tab 11); ROA.5317 (p.69). The SRO consists of the first page work order and two pages of Terms and Conditions that are stapled together and put into a plastic sleeve. ROA.3656; ROA.6015-ROA.6017 (R.E. Tab 9); ROA.6022-ROA.6024 (R.E. Tab 10); ROA.6019-6021 (R.E. Tab 11).

FDDA was again called to work on the CONSTANCE JOY on May 10, 2018 because the starboard engine was losing prime. ROA.6022; R.E. Tab 10. Tyler Jakubas, a marine diesel technician employed by FDDA, was dispatched. ROA.3644; ROA.3650. The SRO for the work was signed by Engineer Waugh on May 11, 2018, who again put his initials in the box on the first page to accept the Additional Terms and Conditions of the Sale Included Herein. ROA.6022 (R.E. Tab 10); ROA.3657; ROA.5317 (p.72).

After the CONSTANCE JOY suffered a breakdown during a sea trial on May 24, 2018, ROA.5193 (p.149), FDDA was called to the yacht for heat exchanger service to the port and starboard engines. ROA.6015 (R.E. Tab 9). Engineer Waugh contacted Jakubas to ask him about the overheating of the engines, ROA.3665, and FDDA gave Jakubas the SRO, ROA.6015 (R.E. Tab 9), consisting of three stapled pages in the clear plastic sleeve. ROA.3659. When Jakubas arrived on the yacht on May 31, 2018, he handed the sleeve to Captain Nicholls, who signed and initialed the SRO in three places,

including the acknowledgement on the first page, "Hereby Accepting the Additional Terms of Sale Included Herein." ROA.3660; ROA.5203 (p.191); ROA.6015 (R.E. Tab 9). Captain Nicholls testified that he would have notified Burgess and Aaron Fischer of the work because the amount would have been above his authority, ROA.5203 (pp.191-92), and because "Nothing gets spent on the boat without approval of management or owner's management once it gets above a certain amount of money." ROA.5200 (p.180). FDDA invoiced $10,000.62 for the work, ROA.6245-ROA.6247 (R.E. Tab 13), and that amount was paid by Captain Nicholls on the vessel credit card. ROA.6253.

Additional work was performed on the CONSTANCE JOY by other contractors after FDDA's work on the heat exchanger, including hauling the vessel out of the water. ROA.2707. The yacht underwent a sea trial on August 24, 2018, approximately three months after FDDA's work. During the sea trial, the vessel lost power and came to an instant idle. ROA.3933; ROA.5340 (pp.161-62). The crew discovered that a rubber hose from the seawater pump had popped off, ROA.5340 (p.163), and sea water sprayed onto the deck heads, main electrical panel, Atlas converter, and generator 1 and generator 2. ROA.3933.

FDDA made *ex gratia* payments totaling $90,000 to Skolnick, ROA.6233; ROA.6234; ROA.6235, as a gesture of "goodwill" and as "a good

business decision" for a "good customer." ROA.3072-ROA.3073. After repairs were completed on the CONSTANCE JOY, the yacht was sold in 2021 for $14,900,000. ROA.6205.

### C. Procedural History

CJ II initiated this litigation by filing a complaint on June 9, 2020 in state court in Broward County, Florida against FDDA and MTU America Inc. (alleging MTU America was responsible for servicing the engines on the CONSTANCE JOY that were manufactured by MTU Friedrichshafen GmbH). ROA.35; ROA.36. FDDA moved to dismiss the state suit, ROA.48, based on the forum-selection clause (for Harris County, Texas) in the SRO governing the work performed by FDDA. ROA.6017 (R.E. Tab 9). FDDA then removed the suit to the United States District Court for the Southern District of Florida. ROA.23. Finding "[a]n apparent agency relationship was present between the Plaintiff, Captain Nicholls, and Engineer Waugh," ROA.189 (R.E. Tab 6), the judge concluded that the SRO's forum-selection clause was "valid and enforceable" and transferred the suit to the Southern District of Texas on August 24, 2020. ROA.193, ROA.198 (R.E. Tab 6).

CJ II filed an amended complaint on October 14, 2020, ROA.245, asserting a single negligence claim against FDDA (failure to properly secure the hose, failure to train its employees, and failure to have sufficient policies

or to enforce them), ROA.250, and a claim of vicarious liability of MTU for the acts of FDDA. ROA. 251.

On June 22, 2021, the judge dismissed MTU on the ground that CJ II failed to elicit facts to establish an agency relationship between MTU and FDDA to support CJ II's vicarious liability claim. ROA.508. After motions for summary judgment from both CJ II and FDDA, ROA.545, ROA.670, ROA.1046, the district judges in Texas[5] found that there were unresolved questions of fact relating to whether the Captain and Engineer had apparent authority to sign the SROs for the work performed by FDDA. ROA.939 (R.E. Tab 7); ROA.2048 (R.E. Tab 8). Accordingly, the case was tried on the issues of the "single claim for negligence against FDDA," whether Captain Nicholls had authority to sign the SRO that limited the liability of FDDA, the application of the language of the contractual limitations to the damages sought by CJ II, and CJ II's damages. (Joint Proposed Findings of Fact and Conclusions of Law, ROA.2296, ROA.2298-ROA.2309, ROA.2309-ROA.2312, ROA.2312-ROA.2321).

On September 3, 2025, the district judge entered his comprehensive Findings of Fact and Conclusions of Law. ROA.2443 (R.E. Tab 4). He

[5] Judge Tipton replaced Judge Hughes to whom the case was originally assigned after the transfer to Texas.

resolved the fact disputes and concluded that FDDA's negligence caused the damage to the yacht, ROA.2498 (R.E. Tab 4); that CJ II was not comparatively at fault, ROA.2508 (R.E. Tab 4); that Captain Nicholls had apparent authority to sign and agree to the SRO with its Additional Terms of Sale, including the limitations in Clause 14, ROA.2503 (R.E. Tab 4); that the limitation clause was enforceable, ROA.2504 (R.E. Tab 4); that CJ II established direct damages of $647,093.512, ROA.2507 (R.E. Tab 4); that CJ II failed to prove that it was entitled to loss-of-charter revenue, ROA.2507-ROA.2508 (R.E. Tab 4); that the damages for personal loss of use of the yacht were $1,930,945 but that the court did not have to decide if those damages were recoverable because of the contractual limitation on consequential damages/loss of revenue, ROA.2508 (R.E. Tab 4); that CJ II's recovery for physical damage/repairs to the yacht was capped at $10,000.62 by Section 14 in the Additional Terms of Sale in the SRO, ROA.2506 (R.E. Tab 4); and that CJ II was entitled to prejudgment interest and post-judgment interest. ROA.2508, ROA.2510 (R.E. Tab 4).

The court entered a Final Judgment on September 3, 2025 in favor of CJ II in the amount of $10,000.62, plus interest, ROA.2512 (R.E. Tab 5), and CJ II filed its Notice of Appeal on October 2, 2025. ROA.2513 (R.E. Tab 2).

FDDA filed a Notice of Cross-Appeal on October 14, 2025. ROA.2518 (R.E. Tab 3).

## SUMMARY OF ARGUMENT

This appeal is a tale of two cases, the one tried to the district judge and the one presented on appeal to this court. The parties tried a dispute over the negligence of the yacht owner[6] and ship repairer, whether any negligence caused damage to the yacht, the amount of damages sustained by the owner of the yacht, and whether the captain of the yacht had authority to enter into a repair order that contained limits on the damages recoverable by the parties.

The district judge made credibility decisions and ruled in favor of CJ II with respect to liability and causation. However, he ruled in favor of FDDA with respect to the authority of the captain to contract for repair of the yacht (including the limitations on damages) and with respect to CJ II's claim for loss of charter hire.

CJ II challenges the findings on the authority of the captain and the recovery of loss of charter hire. However, those findings are amply supported and should be sustained. CJ II also raises, for the first time on appeal, a host

[6] Although the yacht is owned by Constance Joy II Limited, the suit was brought by its parent company, CJ II.

of challenges that it did not present to the district judge, including that the limitation of damages is invalidated by gross negligence and negligence of FDDA, that the limitation is invalidated because it does not deter negligence, that the limitation is unenforceable because of unequal bargaining strength between CJ II and FDDA, and that the limitation is insufficient under Texas law.

The contention that the limitation clause is invalid because it would relieve FDDA of liability for gross negligence (which was not even pleaded by CJ II) fails because this Court has enforced similar clauses when gross negligence was pleaded but not ultimately found. This Court has likewise rejected CJ II's argument that the limitation is invalid with respect to the finding of negligence of FDDA, as it has upheld similar limitations on damages awarded for negligence. This Court has not required deterrence of negligence to uphold limitations, although the district judge properly found that the limitations are sufficient to deter negligence.

The district judge's finding of the equality of the bargaining strength of the parties is compelling in the context of the successful businessman building and operating yachts around the world, towing the yacht across the ocean, and signing documents to insulate his liability and limit the liabilities of others. The judge correctly concluded that the limitation clearly and

unequivocally limited recovery, and CJ II's citation on appeal to inapplicable Texas cases to challenge the enforceability does not alter that conclusion.

CJ II's attacks on the findings of the authority of the captain to enter into the repair contract (with the limitations on CJ II's recovery) and with respect to the failure to prove a claim for loss of charter hire involve disputed facts and credibility choices that were resolved against CJ II, that are not clearly erroneous, and that are wholly proper under general maritime law.

Finally, for the cross-appeal, the district judge did not decide whether CJ II was entitled to recover for loss of personal use of the yacht because the limitation clause prohibits the parties from asserting claims for loss of use. However, if the limitation is held to be unenforceable, the damages claimed for loss of personal use are not recoverable under the maritime law, and there was insufficient evidence to establish loss of use with reasonable certainty.

# ARGUMENT

## I.

## STANDARD OF REVIEW FOR THE APPEAL AND CROSS-APPEAL

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011) (citation omitted). "[T]he clearly erroneous standard of review following a bench trial requires even 'greater deference to the trial

court's findings when they are based on determination of credibility.'" *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020) (citations omitted).

## II.
## INTRODUCTION

This is a case about a highly successful and sophisticated businessman who purposefully created a complex structure of companies in Delaware and the Marshall Islands for his Jamaican-flagged pleasure yacht to limit liability and personal exposure. He outsourced agreements to manage the yacht and its crew (with the manager confirming the overriding authority of the captain of the yacht), and he repeatedly agreed to provisions limiting damages and abrogating liability by insurance arrangements.

When the yacht encountered engine problems, the Captain and Engineer engaged FDDA to perform the work, notifying CJ II's CFO or manager, and the Captain signed a Service Repair Order and initialed his agreement that he accepted the Additional Terms of Sale Included Herein. The Terms in the SRO included two limitations in bold capitals in Section 14: a reciprocal limitation on the liability of the parties with respect to consequential damages/loss of use and a limitation on FDDA's liability to CJ II for any claim to the purchase price of the products on which the claim was based ($10,000.62 in this case). ROA.6017 (R.E. Tab 9).

The yacht suffered damage three months after the repair, and the district court settled the disagreement between CJ II and FDDA over liability with a credibility decision in favor of CJ II that FDDA negligently caused the damage. However, the judge resolved the fact dispute between CJ II and FDDA over the authority of the yacht's captain by finding Captain Nicholls had apparent authority to agree to the terms of FDDA's SRO, including the limitations on damages.

CJ II contends that vessel captains do not have authority to enter into repair contracts that contain limits of liability and that it is proper for the beneficial owner of the yacht to establish a structure to limit his liability, but a provision limiting a repair contractor's liability should not be enforced. However, the district judge properly resolved the fact dispute with respect to the limitation on liability and correctly applied the law to enter judgment limiting the damages awarded against FDDA to $10,000.62.

## III.

## CJ II's Challenges to the Limitation Clause in the SRO

CJ II presents, on appeal, a host of attacks on the validity of the limitation clause in the SRO: it is unenforceable because it exculpates FDDA for gross negligence (Br. p.9), it is invalid for ordinary negligence (Br. pp.14, 18), it is unenforceable because CJ II did not have equal bargaining power

(Br. p.27), and it is unenforceable because it does not clearly express the intent to disclaim negligence liability (Br. p.31, p.49). These issues were not presented by CJ II at the trial, which focused on liability, damages, and the authority of Captain Nicholls to agree to the SRO with the limitation clause. Therefore, they are not properly before this Court. *Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.2d 221, 226 (5th Cir. 2010) ("We will not consider an argument asserted for the first time on appeal."). However, FDDA will address each of the arguments.

### A. Gross Negligence Was Not, and Is Not, an Issue with Respect to the Enforceability of the Limitations

The parties cited maritime law, and the district judge applied maritime law to conclude that the limitation clause "is enforceable under maritime law." ROA.2504 (R.E. Tab 4). The SRO for the work on the CONSTANCE JOY is a "contract for the repair of a vessel," and "is a maritime contract, governed by general maritime law." *One Beacon Ins.*, 648 F.3d at 262.

As reflected in the Joint Proposed Findings of Fact and Conclusions of Law, CJ II asked the judge to conclude that Captain Nicholls did not have actual authority (ROA.2299) or apparent authority (ROA.2300-ROA.2309) to enter into the SRO so that CJ II was not bound by the limitation on damages and that "Clause 14 is inapplicable to this dispute." ROA.2309. CJ II argued that "Contracts 'indemnifying one against his own negligence'—or

in this case, limiting his liability for his own negligence—'should be viewed as *exceptions* to the usual business practice.'" ROA.2305 (citations omitted, emphasis in original). However, that argument was in the context of whether Captain Nicholls had authority to enter into the repair contract that contained the limitations on damages. It did not raise any argument with respect to public policy for limitations on damages for gross negligence because gross negligence was not an issue in this case.

CJ II's brief to this Court (Br. p.9) now changes course to assert a new argument. CJ II cites the concurring opinion of Chief Judge Elrod in *ENSCO Offshore, L.L.C. v. Cantium, L.L.C.*, No. 24-30508, 2025 U.S. App. LEXIS 32480, at *6-*7 (5th Cir. Dec. 11, 2025) with respect to "an unsettled question in [the Fifth Circuit's] law of maritime contract pertaining to exemptions from liability for acts of gross negligence." Chief Judge Elrod stated: "Neither the Supreme Court nor our court has resolved whether parties are permitted to contractually indemnify parties for claims of gross negligence." *Id.* at *7. Chief Judge Elrod noted that the Fifth Circuit did not have to address the effect of gross negligence on limitations of liability in a shipyard contract in a leading case from this Court, *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir. 1982), because the Court concluded that the

district court erred in finding that the ship repairer was grossly negligent. *ENSCO*, 2025 U.S. App. LEXIS 32480 at *8.

Just as this Court did not have to address the issue of the effect of gross negligence on the limitation on damages in a ship repairer's contract in *Todd Shipyards* (because the Court held the shipyard was not grossly negligent), so too the Court in the current appeal is not presented with that issue as:

- CJ II only pleaded "a single claim for negligence against FDDA" and did not plead that FDDA was grossly negligent. ROA.2296.
- CJ II did not raise the issue of gross negligence at trial and only asked the judge to find that FDDA was negligent. ROA.2321.
- The judge only concluded that "FDDA's negligence caused Plaintiff's damages." ROA.2498.

CJ II relies, Br. p.12, on the statement of this Court in *Todd Shipyards* about *the district court's holding* in that case that its finding of gross negligence vitiated a limitation clause.[7] *Todd Shipyards* is similar to the present case as it involved work on the turbines of a vessel pursuant to Todd Shipyards' terms and conditions that contained a "red letter" clause limiting the liability of the ship repairer. *Id.* at 406. The turbines sustained damage from the work, and the district court found that Todd Shipyards was

[7] This Court stated: "A more difficult question to be resolved is the finding by the district court that Todd is guilty of gross negligence which vitiates the red letter clause." 674 F.2d at 411.

negligent, grossly negligent, and liable for the damage. *Id.* at 407, 409. Todd Shipyards was "happy that the district court upheld the validity of its red letter clause limiting its liability," but it was "unhappy because the district court at the same time took away the limitation by holding that Todd was guilty of gross negligence." *Id.* at 409.

On appeal, Todd Shipyards challenged the finding of negligence, but this Court affirmed the finding as it was not clearly erroneous. *Id.* at 410. The Court then considered whether Todd's negligence prohibited enforcement of the red letter clause. The Court had "no difficulty" in affirming the district court's finding that "under the circumstances of this case, the red letter clause is valid." *Id.*

Having upheld the limitation with respect to negligence, this Court considered the finding of the district court that Todd's gross negligence vitiated the red letter clause. *Id.* at 411. The Court concluded that the finding of gross negligence was erroneous. *Id.* Accordingly, the Court did not have to address whether gross negligence vitiates a limitation clause as there was no finding of gross negligence, and the Court held that the clause validly limited the damages with regard to negligence. *Id.* at 410-11.

This Court reached a similar result in *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577 (5th Cir. 1986), which involved a ship

repairer's assertion of a limitation clause to reduce damages owed to the owner of a vessel that was damaged in a fire while undergoing repair. As in the present case, the limitation was included in an authorization signed by the vessel's captain (the captain "was required to sign a job authorization detailing the work to be done and containing the contractual terms between the parties"). *Id.* at 581. The district judge found that the repairer was negligent but was not grossly negligent, *id.* at 580, 581, and the judge limited the repairer's liability in accordance with the limitation clause. *Id.* at 582. This Court affirmed the finding that the repairer was not grossly negligent, *id.*, and declared that the clause was "not void as against public policy." *Id.* at 583. The Court concluded: "We uphold the terms of their bargain." *Id.*

The holdings in *Todd Shipyards* and *Coastal Iron Works* are dispositive of CJ II's claim that gross negligence vitiates the limitation clause because this Court upheld the limitation in both cases when the repairer was found guilty of negligence but not gross negligence. As FDDA was not found (or even alleged to be) guilty of gross negligence, the limitation clause is valid and enforceable for the damages found against FDDA based on negligence.

The other cases cited by CJ II (Br. p.13), *La Esperanza de P.R., Inc. v. Perez y Cia. de P.R.*, 124 F.3d 10 (1st Cir. 1997), *Royal Ins. Co. of Am. v. S.W. Marine*, 194 F.3d 1009 (9th Cir. 1999), and *Sander v. Alexander Richardson*

*Invs.*, 334 F.3d 713 (8th Cir. 2003), also demonstrate the fallacy of CJ II's argument. In *La Esperanza*, the district court found a ship repairer was negligent, but not grossly negligent, and enforced the limitation clause in the repair contract so that the owner could not recover loss of use or profits. 124 F.3d at 15, 19. The owner argued on appeal that the limitation was invalid because the repairer was grossly negligent, but the First Circuit upheld the district court's finding that the repairer was not grossly negligent. *Id.* at 19, 20. The Court affirmed the application of the limitation clause, *id.* at 20, despite the negligence of the repairer, stating that "courts today will enforce red letter clauses that are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability." *Id.* at 19. The holding is equally applicable in the present case in which FDDA was found negligent, but there was no finding or request for a finding of gross negligence.[8]

The decision in *Sander* likewise supports FDDA. That case involved a complete exculpatory clause in a Boat Space Rental Agreement between a yacht club and yacht owners. A fire damaged several vessels, and the yacht

---

[8] In *Royal Insurance*, the district court granted summary judgment to the contractor, enforcing an exculpatory clause purporting to release the contractor from all liability. 194 F.3d at 1013. The Ninth Circuit reversed "[b]ecause Royal [insurer of the vessel] raised a triable issue of fact as to whether Southwest [the contractor] was grossly negligent." *Id.* at 1015. In contrast, CJ II did not raise an issue of gross negligence in the district court.

owners brought claims against the yacht club. *Sander*, 334 F.3d at 713-14. The yacht club was found negligent, and it sought to enforce the exculpatory clause in the Rental Agreements. The yacht owners argued that the complete exoneration of "all" liability for the negligence of the yacht club violated public policy. *Id.* at 718. However, the Eighth Circuit disagreed, holding that the exculpatory clause was "valid and enforceable." *Id.* at 721. The court concluded: "Public policy demands enforcing contracts as written and recognizing the parties' freedom to contract." *Id.*

The Eighth Circuit in *Sander* noted "that no circuit has allowed a party to absolve itself from higher levels of culpability, including gross negligence or recklessness," *id.* at 717 n.3, but the Court agreed that the "issue is not before us, however, as this case deals with ordinary negligence." *Id.* The appeal by CJ II likewise presents only an issue of ordinary negligence, and the uniform authority from the federal appellate courts in *Todd Shipyards*, *Coastal Iron Works*, *La Esperanza*, and *Sander* demonstrates that, at a minimum, in the absence of pleading and proof of gross negligence, ship repairers may contract to limit damages awarded for negligence. As CJ II neither asserted nor established that FDDA was grossly negligent, the district court properly held that the limitation clause in the SRO was enforceable under maritime law.

### B. The SRO Validly Limited FDDA's Liability for Damages Caused by Ordinary Negligence

CJ II asserts (Br. p.14) that the limitation clause in the SRO is invalid "regardless of whether FDDA was grossly negligent in this case." The decisions of this Court in *Todd Shipyards* and *Coastal Iron Works*, upholding limitations on recovery, despite the negligence of the repairer, squarely hold otherwise. As with the gross negligence contention, this Court need not address the argument as it was not raised or presented to the district court. *Offshore Drilling*, 604 F.3d at 226. However, principles applicable to attempts to exonerate a party from all liability have no bearing on clauses limiting damages.

CJ II argues the clause is invalid with respect to ordinary negligence because it does not exclude gross negligence. Br. p.14. As its assertion is contrary to this Court's decisions in *Todd Shipyards* and *Coastal Iron Works*, CJ II cites the Oregon case, *Farina v. Mt. Bachelor, Inc.,* 66 F.3d 233 (9th Cir. 1995).[9] *Farina* involved injuries to a skier and a complete release of

[9] The decision of this Court in *Thomas v. Atl. Coast Line R.R.*, 201 F.2d 167 (5th Cir. 1953), cited by CJ II in its brief (p.15), involved the wholly unrelated question whether, under Florida law, an indemnity clause applicable to "negligent emission of sparks from locomotive engines," *Thomas*, 201 F.2d at 168, "was intended to apply to cases including willful or wanton negligence." *Id.* at 170. The Court did not have to reach that issue because if the agreement could be said to extend to gross negligence, "it would to that extent be illegal." *Id.* The Court in the present case need not apply Florida law to determine whether the limitation extends to gross negligence and whether it is invalid "to that extent" as gross negligence is not part of this case.

liability in a season ski pass at Mt. Bachelor's facility in Oregon. Based on Oregon law, the Court held that the attempt to exculpate itself from "all claims" "rendered Mt. Bachelor's entire release clause invalid." *Id.* at 236. However, principles applicable to attempts to exonerate a party from all liability have no bearing on clauses limiting damages.

CJ II does cite a maritime case (Br. p.15), *Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272 (1st Cir. 2006), which, like *Farina*, involved an "exculpatory clause," *id.* at 273, seeking to "absolve" the defendant, *id.* at 275, of all liability for an injury at a marina. The Court declined to re-write the clause in *Broadley* to exclude gross negligence, but no re-writing of the limitation clause is necessary in the present case as Section 14 in the SRO does not completely exculpate FDDA from liability and, instead, limits recovery of damages as this Court upheld with red letter clauses in *Todd Shipyards* and *Coastal Iron Works*.

In *Todd Shipyards*, the red letter clause contained a limitation on the aggregate damages recoverable against the ship repairer, with no distinction on the limitation between negligence and gross negligence: "In no event shall our liability for any claim arising under this contract exceed in the aggregate the sum of $300,000." *Todd Shipyards*, 674 F.2d at 409 n.2. Yet, this Court had "no difficulty" in affirming the district court's finding that the clause was

valid to limit the liability of the repairer for negligence. *Id.* at 410. The red letter clause in *Coastal Iron Works* also limited damages broadly, with no distinction in the limitation clause between negligence and gross negligence: "in no event shall aggregate liability to all such parties in interest for damages sustained by them, as a result of such injury, or such defective workmanship or material, exceed the sum of $300,000." 783 F.2d at 581. Despite the negligence of the shipyard, this Court upheld the limitation on liability. *Id.* at 583.

The language of the limitations on damages with respect to negligence in *Todd Shipyards* and *Coastal Iron Works* is indistinguishable from the limitation clause in FDDA's SRO ("**SELLER'S MAXIMUM LIABILITY FOR ANY CLAIM BY BUYER SHALL NOT EXCEED THE PURCHASE PRICE OF THE PRODUCTS ON WHICH THE CLAIM IS BASED.**"). ROA.6017 (R.E. Tab 9). Thus, as in *Todd Shipyards* and *Coastal Iron Works*, the limitation in FDDA's SRO is enforceable for the damages held to be caused by the negligence of FDDA. An Oregon case applicable to exculpatory clauses in ski passes and a maritime case applicable to exculpation and not limitation of damages do not detract from the long-standing precedents of this Court that directly govern this case and provide for the affirmance of the district court.

### C. The Limitation Need Not Deter Negligence

CJ II argues that the limitation is unenforceable because it provides no meaningful deterrent to negligence. (Br. p.20). CJ II recognizes that it did not present this issue to the district court, Br. p.20 n.2; however, the district judge addressed the issue in his Conclusions of Law. ROA.2503 (R.E. Tab 4). Thus, in contrast to the arguments with respect to gross negligence and ordinary negligence, which were not raised by CJ II or addressed by the district judge, the issue is subject to this Court's guidance in *Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 226 (5th Cir. 2010) (citation omitted):

> This marks the second point in our opinion in which we table an argument now being made, and return to the arguments made in the district court. The parties are ably represented and surely are making what in their considered judgment are the best ones. We cannot, though, conclude that a district court erred regarding analysis it was not asked to consider. Thus, no purpose is served by considering the new arguments.

The SRO limits the liability of both parties for consequential damages/loss of use, and it also limits the liability of FDDA to the purchase price of the products on which the claim is based. ROA.6017 (R.E. Tab 9). The district judge noted that "There is a split in the circuit courts of appeals on the issue of whether, under admiralty law, an exculpatory clause (also called a red letter clause) that fully absolves a party from liability for its own

negligence is enforceable." ROA.2503 (R.E. Tab 4) (quoting *Sander*, 334 F.3d at 715). The judge found "that the limitation-of-liability clause at issue does not fully absolve FDDA of liability and still provides a deterrent to negligence." ROA.2503 (R.E. Tab 4). Alternatively, he held that the limitation on recovery "is enforceable even if it offers no deterrent." ROA.2504 (R.E. Tab 4).

CJ II argues, on appeal, that ship repair contracts may not include limitation clauses that fail to provide a deterrence to negligence. Br. p.20. However, this Court did not require that the *limitation* clauses in *Todd Shipyards* and *Coastal Iron Works* provide a deterrent to negligence in order to uphold the limitation. In fact, the Court in *Coastal Iron Works* broadly stated: "A shipyard contract limiting liability will be upheld so long as the parties have more or less equal bargaining strength." *Coastal Iron Works*, 783 F.2d at 583. Similarly, in *Todd Shipyards*, the Court agreed with the findings "that the parties to the repair contract enjoyed approximately equal bargaining power and that the red letter clause applied to all orders or work placed with Todd" in affirming the validity of the limitation. *Todd Shipyards*, 674 F.2d at 410.

CJ II's plea to public policy, Br. p.18, is based on cases such as *Bisso v. Inland Waterways Corp.*, 349 U.S. 85 (1955) (holding a towing company's

exculpatory provision from all liability for its negligent towing violated public policy). However, *Bisso* has been bypassed by subsequent decisions. For example, a simple requirement that the owner of the towed vessel name the tug owner on its insurance policy with a waiver of subrogation will validly insulate the towing company from liability, even when the obligation is not mutual, effectively fully exculpating the tower from its own negligence. *BASF Wyandotte Corp. v. The Tug Leander, Jr.*, 590 F.2d 96, 97 (5th Cir. 1979) (citing the cases from this Court). The Court has applied similar principles to permit parties to a broad range of maritime contracts[10] to *fully* exculpate themselves from negligence, as in the case cited by the district judge, *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 540-41 (5th Cir. 1986).[11] ROA.2504 (R.E. Tab 4).

CJ II's attempt to distinguish *Theriot* as involving mutual indemnification is unavailing as this Court has upheld unilateral obligations in maritime contracts, without any requirement for deterrence of negligence.

---

[10] The First Circuit noted that red letter clauses "are today routinely enforceable." *La Esperanza,* 124 F.3d at 19.

[11] CJ II's statement, Br. p.21, that this Court has "construe[d] *Theriot* narrowly and constrain[ed] it to its facts" (quoting *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1049 (5th Cir. 1990)) is not pertinent to this appeal or to this Court's treatment of exculpatory clauses. That statement arose during the Court's struggle for thirty years over admiralty contract jurisdiction that was finally resolved in the en banc decision in *In re Larry Doiron, Inc.*, 879 F.3d 568 (5th Cir. 2018) (en banc), citing *Theriot* and noting that the Court had recently "affirmed" *Theriot's* jurisdictional analysis. *Id.* at 575.

*E.g., Lirette v. Popich Bros. Water Transp., Inc.*, 699 F.2d 725, 726 n.4, n.5, 727-28 (5th Cir. 1983). Thus, the district judge was correct to enforce the limitation regardless of whether the limitation deterred negligence.

### D. The District Judge Correctly Found that the Limitation Adequately Deters Negligence

Although the district judge correctly held that the limitation was enforceable even if it offered no deterrent to negligence, he found that the limitation clause "provides a deterrent to negligence." ROA.2503 (R.E. Tab 4). CJ II argues, for the first time on appeal, Br. p.22, that the provision limiting damages to the purchase price of the products on which the claim is based, ROA.6017 (R.E. Tab 9), is inadequate. CJ II does not cite to a single case explaining how this type of clause in a contract for ship repair is inadequate. It merely compares the SRO clause to cases with larger limitations and gives its opinion that the amount is inadequate.

Chief Judge Elrod described the omnipresence of red-letter clauses and their purpose in her concurring opinion in *ENSCO*:

> Red-letter clauses are commonly included in marine service, shipbuilding, and ship repair contracts. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 5:16 (7th ed. Nov. 2025 update). Generally, these clauses are written to "(1) exclude express and implied warranties; (2) limit the time for filing suit; (3) place a ceiling on damage exposure; (4) limit liability to the cost of repair or replacement of the defective material or workmanship; (5) exclude consequential damages such as lost profits, lost charter

> hire; (6) exclude specific risks such as liability for pollution, third party claims, and force majeure occurrences; and (7) exclude the cost of defense and attorneys' fees." *Id.*

*ENSCO*, 2025 U.S. App. LEXIS 32480 at *8 n.1. Her point about the prevalence of limitations like those in this appeal is illustrated by the fact that the beneficial owner of the CONSTANCE JOY, Barry Skolnick, signed multiple agreements exculpating fault or limiting damages in addition to the three SROs that were signed by his captain and engineer.[12]

Limitations that have been upheld have taken many forms. CJ II cites the limitations in *Todd Shipyards* and *Coastal Iron Works* in the amount of $300,000. The repair contract in *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1487 n.2 (9th Cir. 1983) excluded liability for special or consequential damages, delay or loss of use of the vessel and profits; limited damages to $100,000; and provided that its liability extended sixty days from redelivery of the vessel. The appellate court only had to address the validity of the time limitation as it resulted in a *complete denial* of the claim, even for defective repairs that were not discovered until after the running of the limitation period. *Id.* at 1488. The Court in *American Queen* began with the "well settled" admiralty principle that "the parties to a

---

[12] Standard Crew Management Agreement, ROA.3843, ROA.3845, ROA.3850; Yacht Management Agreement, ROA.3863, ROA.3866, ROA.3867; Yacht Construction Contract, ROA.3781.

repair contract may validly stipulate that the shipowner is to assume all liability for *all* damage occasioned by the negligence of the shipyard." *Id.* (emphasis in original). It found "compelling" the logic "that if a clause relieving a repairer of all liability for negligence is valid, then *a fortiori*, a clause agreed to under similar conditions but on limiting liability must also be valid." *Id.*

Clauses as in the current appeal, limiting damages to the amount paid for the work, have become common in the ship repair industry. They are less arbitrary than a set amount that is unrelated to the extent of the work that was performed, and they have been upheld as in the Eleventh Circuit's decision in *Diesel "Repower", Inc. v. Islander Invs., Ltd.,* 271 F.3d 1318, 1325 (11th Cir. 2001) ("it is clear and unequivocal that Diesel's liability may not exceed $45,000," which was the price for the reconditioned engine).

CJ II's argument that the amount of the limitation is insufficient to deter negligence is unsound. The Clause contains two provisions. One is a mutual release for incidental, reservoir, pollution, special, exemplary, indirect, or consequential damages, including loss of use, revenues, and profits from the failure of either party. That limitation can include large losses for both the shipyard and yacht in myriad situations that this Court addresses frequently. Both parties have an interest, with mutual limitations,

to avoid conduct that can cause uncompensated losses. The second limitation caps the maximum liability for the ship repairer at the cost of the work. Thus, as more work is performed, the limit on damages becomes progressively higher. No company will exist for long if it is not paid for the work it performs. Accordingly, the loss of a company's livelihood is a deterrent to performing substandard work.[13] In summary, each limitation in Section 14 deters negligence. CJ II did not raise this argument to the district judge, but the judge properly ruled that the clause provides a deterrent to negligence, and his finding should be affirmed by this Court.

### E. The District Judge Correctly Found that the Parties Had Equal Bargaining Strength and that FDDA Did Not Exert Superior Power

CJ II argues that the limitation is unenforceable because CJ II did not have equal bargaining power, Br. p.27, and because FDDA purportedly exerted its superior power with the terms of the SROs that the Captain and Engineer signed three times. Br. p.30. These arguments are raised by CJ II for the first time on appeal; however, the district judge correctly found against CJ II on these points. ROA.2503 (R.E. Tab 4).

[13] The district judge cited *Marine Diesel Specialists, Inc. v. M/Y "BG3"*, 2020 AMC 21, 2020 U.S. Dist. LEXIS 10001 (S.D. Fla. Jan. 17, 2020), in which the judge found that a similar limitation ("aggregate liability under all circumstances shall be limited to the total monetary award invoiced for repairs, including parts and labor"), *id.* at *6, properly limited the repairer's liability, stating: "The clause does not absolve MDS of all liability, and still provides a deterrent to negligence." *Id.* at *28.

CJ II contends that the parties had unequal bargaining power because FDDA was the exclusive company in South Florida that could repair the engines so that they would remain under warranty. Br. p.28. CJ II's argument is not responsive, nor persuasive. The beneficial owner of CJ II is a sophisticated and successful businessman who owned several luxury yachts, 33-feet, 42-feet, and 80-feet, before spending over $15 million to hire an Italian shipbuilder to construct the 125-foot CONSTANCE JOY that he flagged in Jamaica. ROA.2956; ROA 3814. He then created a Marshall Islands company and Delaware company to insulate himself from liability, ROA.3808; ROA.3815, and hired Burgess to manage the yacht and to provide the crew, including the Captain and Engineer. ROA. ROA.3838; ROA.3856.

CJ II sought the services of FDDA when the engines of the yacht needed repair. Its complaint that there was only one authorized repairer in South Florida does not change the bargaining position of a yacht owner who chose to build a luxury yacht in Italy and then transported the yacht across the ocean to Florida on a barge. ROA.2973. Buying a luxury yacht from an Italian builder to operate thousands of miles away was a choice that Skolnick voluntarily made and that necessarily influenced the repair options. If CJ II was unwilling to agree to the terms of the SROs, it could have chosen another repairer in the United States (or elsewhere). It did not. More important, the

equality of the bargaining position was demonstrated in dollars and cents by the fact that FDDA made payments of $90,000 to Skolnick after the incident as a gesture of goodwill to keep a good customer for further business. ROA.3072-ROA.3073. The district judge correctly found that the beneficial owner, "Skolnick, an experienced boater of 40 years who employed a professional captain, had roughly equal bargaining strength with FDDA." ROA.2503 (R.E. Tab 4).[14]

CJ II also complains that the district judge erroneously found no evidence that FDDA exerted superior bargaining power in this transaction. ROA.2503 (R.E. Tab 4). The only support cited by CJ II is that the SRO contained the provisions which limit CJ II's damages—provisions that are commonly included in ship repair contracts and other maritime contracts. What CJ II does not mention is that CJ II's Captain and Engineer agreed to the provisions three times over a period of two months, repeatedly asking FDDA to perform additional work and signing SROs without question or comment. Each time FDDA performed work, the Captain or Engineer signed

---

[14] In *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986), the Supreme Court addressed a maritime products liability claim against the manufacturer of turbines on supertankers that failed and stated: "The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude on the parties' allocation of risk." *Id.* at 873 (citations omitted).

the SRO and separately initialed, expressly "Accepting the Additional Terms of Sale Included Herein, ROA.6015 (R.E. Tab 9); ROA.6019 (R.E. Tab 11); ROA.6022 (R.E. Tab 10), without any objection, as reflected in the SRO that was signed by Captain Nicholls for the applicable work:


SIGNED ______ DATE 05/31/18

** This charge represents costs and profits to the motor vehicle repair facility for miscellaneous shop supplies or waste disp... State of Florida. ***FS403.7185 mandates a $1.50 fee for each new or remanufactured ba...

FOR YOUR RECORDS

Component ID

I hereby authorize the above repair work to be done along with the necessary material and h... to operate the vehicle or engine herein described on streets, highways or elsewhere for the ... mechanic's lien is hereby acknowledged on the above vehicle or engine to secure the amount of repairs thereto. Repairer is not responsible for the loss or damage to articles left with or in the vehicle or engine in case of fire, theft or any other cause beyond its control.

Please initial:

Notice: *Hereby Accepting the Additional Terms of Sale Included Herein.*

Initials

Please sign:

CUSTOMER OR AUTHORIZED AGENT

ROA.2500 (R.E. Tab 4).

CJ II cites no evidence that it sought different terms. Like the beneficial owner, Skolnick, who unquestioningly signed contractual provisions with limitations and exculpations, the Captain and Engineer freely acknowledged and agreed to the provisions. As the Ninth Circuit stated in *Royal Insurance*, 194 F.3d at 1014, "we have refused to invalidate an exculpatory provision in a ship repair contract where the ship owner 'assented without complaint to the terms of the agreement.'" (Quoting *American Queen*, 708 F.2d at 1488). In reversing a finding of overreaching, the Eighth Circuit in *Sander*, 334 F.3d at 720 stated: "None of the boat owners claim that they attempted to negotiate any of the terms of the slip agreement and were unable to do so because of the Yacht Club's superior bargaining power or refusal to negotiate

or that they even objected to the exculpatory clause." The finding sought by CJ II likewise would have been clearly erroneous.

### F. The District Judge Correctly Concluded that the SRO Clearly and Unequivocally Limited CJ II's Recovery for Negligence

CJ II's argument that the provisions in the SRO did not clearly and unequivocally limit its recovery for negligence, Br. p.31, is also raised for the first time on appeal; however, the district judge carefully analyzed the terms of the SRO and properly held that the limitation was enforceable. ROA.2504 (R.E. Tab 4). He explained that the first sentence reciprocally prevents both parties from recovery of indirect and consequential damages, including lost revenues and lost profits, and the second sentence limits FDDA's maximum recovery for any claim to the price of the products on which the claim is based. ROA.2504 (R.E. Tab 4).

CJ II's attack on the limitation again conflicts directly with the decisions of this Court upholding the validity of provisions that are similar to the damage limitation in Section 14 of the SRO: "**SELLER'S MAXIMUM LIABILITY FOR ANY CLAIM BY BUYER SHALL NOT EXCEED THE PURCHASE PRICE OF THE PRODUCTS ON WHICH THE CLAIM IS BASED**." ROA.6017 (R.E. Tab 9). The limitation that this Court upheld in a negligence claim in *Todd Shipyards* provided: "In no event shall

our liability for any claim arising under this contract exceed the aggregate sum of $300,000." *Todd Shipyards*, 674 F.2d at 409 n.2. The limitation that this Court upheld in *Coastal Iron Works* provided that "in no event shall aggregate liability to all such parties in interest or damages sustained by them, as a result of such injury, or such defective workmanship or material, exceed the sum of $300,000." *Coastal Iron Works*, 783 F.2d at 581.

CJ II relies, Br. p.32, on cases such as *Broadley*, 471 F.3d at 275, and *Edward Leasing Corp. v. Uhlig & Assocs., Inc.*, 785 F.2d 877, 889 (11th Cir. 1986), which address the clarity of complete **exculpatory** clauses. The cases have no application in the present case, as recognized in *Edward Leasing*, which noted the difference between "an absolute exculpatory clause" and clauses that "limited the ship repairers' liability." *Id.* at 888, 889. In fact, *Edward Leasing* cited *Todd Shipyards* (and other cases) for the principle that parties to repair contracts "may validly stipulate that the repairer's liability is to be limited, but the cases have not allowed for total absolution of liability." *Id.* at 888. As the limitations in Section 14 have been repeatedly upheld by this Court for negligence claims, the district judge correctly held that the clause is valid and limited the damages recoverable by CJ II.

### G. The District Judge Correctly Held that the Captain of the Yacht Bound the Owner to the Terms of the Repair Contract

The district judge found that the Captain of the CONSTANCE JOY, Anthony Nicholls, had apparent authority to agree to the terms of the SRO, including the limitation clause. ROA.2499-ROA.2503 (R.E. Tab 4). The judge made a credibility determination, finding that FDDA's technician, Tyler Jakubas, believed that Captain Nicholls signed and initialed the SRO as the "customer or authorized agent," and that custom and practice in the marine industry and aboard the yacht confirm that he "held himself out as such, was reasonably believed to be the captain, and acted as an 'authorized agent' of the vessel with the authority to sign contracts and agree to their terms." ROA.2500 (R.E. Tab 4). He also found "that FDDA reasonably relied on Captain Nicholls's role as the captain of the Yacht and that it was reasonable for FDDA to believe that he had the authority to sign the May 29th SRO." ROA.2501 (R.E. Tab 4).

Citing this Court's decision in *Coastal Iron Works*, the judge concluded that Captain Nicholls had "authority to hire FDDA," ROA.2501 (R.E. Tab 4), and that authority included agreeing to the limitation clause. ROA.2501,

ROA.2503 (R.E. Tab 4).[15] His decision was compelled by the holding in *Coastal Iron Works*, 783 F.2d at 582 (citation omitted):

> Third, the DABNEY PETTY's captain acted within the scope of his authority in signing the repair contract containing the red letter clause. A ship's captain is master of his vessel in every sense of the word. He has broad authority and responsibility in the ship's successful operation. He has implied authority to enter into agreements to ensure proper care for the ship and its crew. We, therefore, hold Petty Ray bound by Captain Lucky's action.

The Court's holding in *Coastal Iron Works* did not break new ground. Seventy years ago, Judge Brown stated: "'The master is the commander of the ship—lord of his little world. He is master in every sense of the word . . . .'" *United Geophysical Co. v. Vela*, 231 F.2d 816, 819 (5th Cir. 1956) (quoting *The BALSA*, 10 F.2d 408, 409 (3d Cir. 1926)).[16]

CJ II argues that FDDA failed to establish that it reasonably believed that the SRO was executed by the vessel's captain. Br. p.37. However, the district judge found that Jakubus "credibly testified that Captain Nicholls

---

[15] The decision of the Texas judge, after trial, is similar to the ruling made by the district judge in Florida, who enforced the forum-selection clause in the SRO, stating: "The agency relationship between a captain and the owner of a vessel makes the owner of a vessel responsible for both contracts made by the captain, as well as the captain's torts committed within the scope of his employment." ROA.189 (R.E. Tab 6).

[16] This Court has repeatedly stated: "The ship's master or other person, such as a charterer, to whom the vessel is entrusted is presumed to have authority to purchase necessaries to the credit of the vessel." *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 224 (5th Cir. 1999) (quoting *Ferromet Res., Inc. v. Chemoil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993)).

signed the May 29th SRO, a fact corroborated by Captain Nicholls at his own deposition."[17] ROA.2501 (R.E. Tab 4). Jakubas had previously performed work on the CONSTANCE JOY and obtained the signature of Engineer Waugh on the SRO for that work. ROA.6022 (R.E. Tab 10); ROA.3657; ROA.5317 (p.72). During the time he spent working on the yacht, Jakubas observed "Captain Nicholls performing his duties as the captain," ROA.3663, and "Engineer Waugh performing his duties as the engineer." ROA.3664.[18] The testimony amply supports the finding that FDDA believed the SRO was signed by the captain.

CJ II challenges to the finding that Captain Nicholls never informed FDDA that he lacked authority to sign the SRO,[19] arguing that Nicholls'

---

[17] Jakubas testified:

> Q. Okay. And when you took this three pages that were stapled together in the clear plastic coating to the vessel, did you give it to the captain?
>
> A. Yes.
>
> Q. Okay. After you gave it to the captain, what did he do?
>
> A. He signed it and he took pictures of it.

ROA.3659.

Captain Nicholls admitted that he signed and initialed the SRO and that Burgess and Aaron Fischer (CFO for CJ II and Skolnick's interface with the crew, ROA.2979) would have been notified, ROA.5203 (pp.191-92), and authorization would have to have been "agreed to" by Burgess or Fischer. ROA.5203 (p.192); ROA.5204 (p.193).

[18] Captain Nicholls confirmed that Jakubus would not have been allowed onto Fisher Island to perform the earlier work on the vessel without his permission, ROA.5202 (p.186), and when they came aboard "I would just go and say hello, make myself known, face to a name sort of thing." ROA.5202 (p.185).

[19] Jakubas testified:

silence is irrelevant because FDDA was not allowed to make assumptions about the authority of the captain. Br. p.38. However, CJ II's argument turns the apparent authority exercised by vessel captains on its head. As this Court has stated that the captain is "lord" of the ship and "has implied authority to enter into agreements to ensure proper care for the ship and crew," there is no need to second guess his authority to enter into contracts. The Supreme Court declared: "So far as respects such contracts made by the master in the usual course of employment of the vessel, and entered into with a party who has no notice of any restriction upon that apparent authority, those maritime usages may safely be considered to make part of our law . . . ." *The SCHOONER FREEMAN v. Buckingham*, 59 U.S. (18 How.) 182, 189-90 (1856); *see also Rybovich Boat Co. v. M/Y Blue Star*, 546 F. Supp.3d 1270, 1277 (S.D. Fla. 2021) (quoting *Epstein v. Corporacion Peruna de Vapores*, 325 F. Supp. 535, 536 (S.D.N.Y. 1971)) ("the master of a vessel possesses full authority to make purchases binding upon the vessel's owner for 'necessaries' to be used on board his own ship unless the contrary is clearly stated to all concerned").

---

> Q. Did he ever indicate to you that he lacked authority to sign the service order after he read the three-page document and snapped pictures with his phone?
>
> A. No.

ROA.3661.

CJ II objects to the district judge's finding that the captain's authority to enter into a contract for repair of the engines extends to the terms of the SRO, including the limitation on damages. Br. p.40. The district judge cited The Restatement (Second) of Agency § 35 for the principle that "authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." ROA.2502 (R.E. Tab 4). As CJ II conceded "that Captain Nicholls had Plaintiff's authority to engage FDDA to perform the engine repair, and to pay FDDA for its work using the vessel's credit card," ROA.2413, the district judge concluded that the captain "also had the authority to do so in the usual manner, including executing a standard contract containing standard terms like a limitation-of-liability clause." ROA.2502 (R.E. Tab 4).

CJ II complains about the "incidental" authority of the captain, but that argument is immaterial. Restatement (Second) of Agency Sections 35 and 50 both state that when authority is given for a transaction or contract it includes authority to enter into a contract or do acts that are incidental to it, usually accompany the transaction, **or** are "reasonably necessary to accomplish it." Section 51 provides that authority to make a specific contract includes authority to enter into a contract with "usual terms" or "in an appropriate way" "and" to do other incidental acts. All of these sections

unequivocally authorized Captain Nicholls, who was authorized to agree to the repair, to enter into the contract with usual or reasonable terms **and** to do other incidental acts. The district judge was correct: "Plaintiff's argument misses the mark." ROA.2502 (R.E. Tab 4).

CJ II also argues that FDDA failed to prove that the limitation clause is usual in the industry. Br. p.43. Section 51 gives authority to enter into a contract in "an appropriate way." Sections 35 and 50 give authority to enter into a contract or do acts that are "reasonably necessary" to accomplish the transaction. The judges of this Court and other maritime courts have considered limitations on recovery in shipyard contracts for more than half a century without requiring anyone to tell them what is necessary or appropriate for a contract. As discussed at length herein, the limitations differ. However, as this case reflects, Captain Nicholls and Engineer Waugh signed agreements with limitations that are common and that were necessary to effectuate service. Accordingly, the limitations were valid and enforceable.

Finally, CJ II argues that this Court's decision in *Coastal Iron Works*, Br. p.47 (holding that the master had "implied authority" to bind the owner) has no bearing on this case because implied authority only relates to actual authority and not apparent authority. This argument was not presented to

the district judge and is not responsive to the specific finding "that Captain Nicholls had the authority of Skolnick, Fischer, and Burgess to call FDDA for the service repair, sign the May 29th SRO, issue the credit card deposit authorization, and pay for the repair work." ROA.2502 (R.E. Tab 4).[20] The judge rejected CJ II's argument that Captain Nicholls lacked "apparent authority to *also* bind Plaintiff to *additional* terms" in the limitation clause ROA.2502 (R.E. Tab 4) (emphasis in original). That is precisely what happened in *Coastal Iron Works* in which this Court affirmed the authority of the captain to agree to the limitation. As CJ II admits, "*Coastal Iron Works* is the elephant in the room." (Br. p.47). However, its holding applies and limits the recovery for CJ II.

### H. The Limitation is Enforceable under Texas Law

CJ II argues, BR. p.50, that the enforceability of the SRO is a question of maritime law, but the interpretation of the SRO is a question of Texas law because the SRO contains a provision for application of Texas law. ROA.6017 (R.E. Tab 9). It presents for the first time on appeal the issue it did not assert to the district court, that the Texas express negligence rule prohibits the limitation on damages awarded because of the finding of FDDA's negligence.

[20] FDDA argued at trial that Captain Nicholls had both actual and apparent authority. ROA.2299, ROA.2300.

As in *Offshore Drilling*, 604 F.3d at 226, this Court should not conclude that the "district court erred regarding analysis it was not asked to consider."

CJ II's analysis of the terms of the SRO demonstrates the fallacy of its argument. CJ II notes that Clause 12, which addresses indemnification, expressly requires "negligence;" however the limitation on damages involving the contracting parties, CJ II and FDDA, does not mention "negligence." BR p.51. That is, of course, because a provision requiring a party to fully indemnify another for the indemnitee's negligence causing damages to a third party is an "extraordinary obligation." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981). As noted by CJ II, Texas courts have applied the express negligence test to contractual provisions seeking indemnity for the negligence of the indemnified party in a suit brought by a third party. *E.g., Ethyl Corp. v Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987). However, the claim asserted by CJ II against FDDA does not involve indemnity in a claim brought by a third party, nor does it involve a complete exculpatory clause or a complete release of all liability. The claim involves a reciprocal limitation on consequential damages and a limitation on the total recovery by the yacht owner against the repairer.

The Texas Supreme Court applied a contractual limitation on recovery to a contracting party in *S.W. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 577

(Tex. 1991) without talismanic language required for indemnity agreements (upholding a limitation to the amount paid for an erroneous directory listing). Other Texas courts have upheld limitations on damages with no mention of negligence. For example, in *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731 (Tex. App.—Ft. Worth 2005, no pet.), the court upheld the district court's application of a limitation clause in a real estate inspection contract with respect to claims of negligence and breach of contract. *Id.* at 734. The clause limited liability to the amount paid for the inspection, not to exceed $500, and the clause made no mention of the word "negligence." *Id.* at 747-48. Finding "legitimate commercial reasons" to allow the limitation, *id.* at 748, the court affirmed the application of the clause to limit liability for negligence to the price for the services ($348.27). *Id.* at 747, 749. Similarly, the limitations in the SRO do not violate Texas law.

## IV.

## THE DISTRICT JUDGE CORRECTLY FOUND THAT CJ II FAILED TO ESTABLISH ANY BASIS FOR RECOVERY OF CHARTER HIRE

Faced with the clearly erroneous rule, CJ II is left to argue that the findings of the district judge (that CJ II "failed to establish any basis for loss of charter hire") are "internally inconsistent." (Br. p.54). However, the findings are cumulative, not inconsistent; they are fully supported by the evidence; and they demonstrate that CJ II was not entitled to any recovery

for loss of charter hire. Moreover, damages for loss of use are not permitted by the limitation clause in the SRO.

CJ II's evidence falls short of the requirement that that damages for loss of use of a vessel must be proved with "reasonable certainty;" they "must not be merely speculative;" and "something else must be shown than the simple fact that the vessel was laid up for repairs." *Ove Skou v. United States*, 478 F.2d 343, 345 (5th Cir. 1973) (quoting *The CONQUEROR*, 166 U.S. at 125, 127).[21]

Skolnick never chartered any of the boats he owned before the CONSTANCE JOY. ROA.2979. Even before Burgess submitted the Yacht Management Agreement dated December 11, 2017, ROA.3873, Burgess began sending emails to Skolnick or to his CFO, Aaron Fischer, offering to market or charter the yacht and persistently following up for more than a year when Skolnick declined to move forward toward an agreement to commercially charter the yacht. ROA.4275 (March 22, 2017); ROA.4348 (April 3, 2017); ROA.4274 (November 17, 2017); ROA.4300 (November 17, 2017); ROA.4305 (November 17, 2017); ROA.4266 (January 2, 2018);

---

[21] CJ II cites *The CONQUEROR* (Br. p.54 n.11) for the statement that capability of the vessel for charter is sufficient for an award; however, the Court in that case rejected an award, stating that the vessel "was purchased by her owner for his personal pleasure, and there is not an atom of testimony tending to show that he bought her for hire, or would have leased her if he had been able so do so . . . ." 166 U.S. at 133-34.

ROA.4335 (January 4, 2018); ROA.4307, ROA.4317, ROA.4330 (March 26, 2018, March 27, 2018, March 29, 2018, March 30, 2018, April 2, 2018); ROA.4350 (April 13, 2018). However, Skolnick let the high market pass and never signed the agreement, nor did he take the steps necessary to prepare the yacht for charter.

CJ II's excuse, and the basis for its assertion that the facts found by the judge are inconsistent, is that the yacht was not functional. That does not refute the failure to introduce an "atom" of evidence, as in *The CONQUEROR*, that Skolnick brought the vessel for hire or would have been able to do so. Burgess explained that CJ II could "get the ball rolling" with the brochure and the website so that the yacht would be ready to charter. ROA.4300. It explained that they could "get the wheels in motion" and "be ready to move forward." ROA.4275. Burgess suggested the "toys" to purchase to aid in chartering. ROA.4305. Skolnick acknowledged that he would have to add "a life raft or two" for a commercial charter. ROA.2794. The yacht would have to change its registration from a pleasure craft. ROA.3804.[22] All of these steps could be taken after signing a contract with Burgess or while

---

[22] The facts presented in this case are similar to *Shackleford v. Sailor's Wharf, Inc.*, 2017 AMC 482, 2016 U.S. Dist. LEXIS 106177, at *18 (M.D. Fla. Aug. 11, 2016), in which the judge denied a claim for loss of use of a pleasure boat that was damaged during repair, rejecting the owner's claim for "normal charter rates" based on the assertion that "he intends to make future commercial use" of the vessel that was registered for "Recreation" and had no history of commercial use.

the vessel was being repaired to functionality if Skolnick had *any* intent to charter the vessel.[23] Yet Skolnick did not take any of these steps and allowed Burgess's nine requests to remain unfulfilled. ROA.2794-ROA.2802. Skolnick declined every opportunity to prepare the boat to charter or to sign a charter agreement, ROA.2802, and he sold the boat without ever chartering it. Burgess, which was keen on chartering the vessel, did not see anything inconsistent with getting the yacht ready to charter while it was being repaired, and neither did the district judge. The judge was amply supported in declining an award for loss of charter hire.

## V.
## CROSS-APPEAL

The district judge found that CJ II established damages of $1,930,945 for personal loss of use of the yacht for 98 days during low season and 28 days during high season at daily charter rates of $17,062.50 during low season and $18,687.50 during high season, for a gross total of $2,195,375. He deducted operating expenses of $264,430 for a net loss of $1,930,946.

---

[23] The fallacy of CJ II's argument is demonstrated by the assertion that taking steps such as purchasing additional equipment or changing the registration of the vessel would have been unnecessary and a "waste of time" while the yacht's repairs were being completed. Br. p.55. The preliminary steps would only have been a waste of time and unnecessary if Skolnick never intended to charter the yacht. And, if Skolnick intended to charter the vessel as soon as the repairs were complete, he would have needed to get the ball rolling and contact his insurance broker to begin the placement.

ROA.2497 (R.E. Tab 4). However, the judge did not have to consider or decide if the damages were recoverable under admiralty law as he held that the damages were barred by the SRO's limitation on damages. ROA.2508 (R.E. Tab 4). The damages sought by CJ II for loss of personal use are not recoverable, legally or factually, regardless of the limitation in the SRO, and FDDA cross-appeals to request that this Court hold that these damages were not recoverable or were not sufficiently proven in the event the Court declines to uphold the limitation on damages.

### A. CJ II Is Not Entitled to Recover Loss of Personal Use

More than one appellate court has described *The CONQUEROR*, 166 U.S. 110 (1897), as the "seminal case" with respect to damages for loss of use of a pleasure boat. *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000); *Snavely v. Lang*, 592 F.2d 296, 298 (6th Cir. 1979). In *The CONQUEROR*, the Supreme Court rejected an award of loss of use of a pleasure yacht, emphatically stating: "There must be a pecuniary loss, or at least a reasonable certainty of pecuniary loss, and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure . . . ." 166 U.S. at 133. The Court concluded: "In other words, there must be a loss of profits in its commercial sense." *Id.* Thus, "Under federal maritime law loss of use of a private pleasure boat is not a

compensable item of damages." *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 257 (9th Cir. 1973). "*The Conqueror* has been interpreted as creating an iron-clad rule that under federal maritime law demurrage is not an allowable item of damage for loss of a private pleasure craft." *Snavely*, 592 F.2d at 298.

CJ II argued, ROA.2226, that loss of personal use of a vessel is a proper subject of damages, citing *Finkel v. Challenger Marine Corp.*, 316 F. Supp. 549 (S.D. Fla. 1970). *Finkel* permitted an award of damages for loss of use of a yacht, stating that "a private pleasure yacht falls in the same category as any other repairable chattel, such as an automobile." *Id.* at 555 (citing *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170 (1932) and Florida law).[24]

Appellate courts across the country have rejected CJ II's argument and have held that *The CONQUEROR* retains its "full vitality." *Snavely*, 592 F.2d at 299 (denying recovery for loss of use of pleasure yacht); *Central State Transit*, 206 F.3d at 1376, 1377 (denying recovery of loss of use of a private pleasure vessel and recognizing "the continuing validity of the general rule set forth" in *The CONQUEROR*); *Oppen*, 485 F.2d at 257 n.12 (citing *The*

---

[24] *Brooklyn E. Dist. Terminal* involved the use of a commercial tug, but the Court, in dictum, stated: "The vessel may be a yacht, employed for pleasure and not for business. Even then, in the judgment of many courts, the value of the use may be considered by the triers of the facts in fixing the recovery if there has been a substantial impairment in the enjoyment for which such vessels are maintained." *Id.* at 175.

*CONQUEROR* and rejecting *Finkel* and application of the language in *Brooklyn E. Dist. Terminal* as "dictum"); *Thomson v. United States*, 266 F.2d 852, 856 (4th Cir. 1959) (citing *The CONQUEROR* in a case involving damage to a yacht for the principle that "Demurrage is not allowable damage in a case of this sort, for valuation of the loss of a pleasure craft is highly speculative and immeasurable.").

The overwhelming weight of authority rejects recovery for loss of use of a pleasure boat that has no history of commercial use or earning of profits, and there is no reason for this Court to deviate from that rule in this case. Accordingly, if this Court does not enforce the limitation of recovery in the SRO, it should hold that CJ II is not entitled to recover loss of personal use of the CONSTANCE JOY.

### B. CJ II Failed to Establish a Claim for Loss of Personal Use of the CONSTANCE JOY

The district judge based his finding that Skolnick sustained damages for loss of personal use of the CONSTANCE JOY on the estimate of CJ II's CFO, Aaron Fischer, that Skolnick would have used the yacht 98 days during the low season and 28 days out of the high season. ROA.2497 (R.E. Tab 4). The judge did not cite evidence from Skolnick for his decision as Skolnick did not testify about his expected personal use. Fischer's testimony about Skolnick's intent is, at best, speculation based on hearsay from a discussion

between Skolnick and Fischer: "we said, you know, in the most part, you're going to use the boat, what, one week a month," ROA.3229, without any contemporaneous vessel schedules, projections, or other evidence of expected personal use during the ownership of CJ II to support the claim. At worst, the assertion is contradicted by Fischer's testimony that Skolnick is a "very busy guy," ROA.3238, and by the fact that Skolnick did not take a single cruise on the vessel after September 2017. ROA.3235, ROA.3237.

The evidence in support of loss of personal use is like that in *The CONQUEROR*: "[W]e are bound to say that their testimony falls short of establishing such a case of loss of profits as entitles the libellant to recover this large sum for the detention of his yacht." 166 U.S. at 133. The assessment of $1,930,945 for loss of use of a vessel that had been used by Skolnick only for a few hours on one day for a birthday party during the twelve months prior to the damage, ROA.2496 (R.E. Tab 4), compares with the Court's statement in *The CONQUEROR* that the amount is "so great as, if not to shock the conscience, at least to induce the belief that it must have been estimated by witnesses who were most friendly to the owner." *Id.* at 134. The source of the evidence in this case, Aaron Fischer, admitted: "I would wash Mr. Skolnick's cars if he wanted me to." ROA.3244.

In summary, damages for loss of personal use of the yacht are not recoverable, as they are "loss of use" within the limitation of liability in Section 14 of the SRO. Alternatively, they fall within the maximum liability of the amount charged for the work performed by FDDA, $10,000.62. However, if this Court determines that the SRO limitation is unenforceable, it should reject the claim for loss of personal use on the merits because damages for the loss of use of a pleasure yacht are not recoverable under maritime law, and the evidence is insufficient even if they were allowed.

## CONCLUSION

The district judge resolved the fact disputes between the parties after a trial with multiple witnesses and more than 2500 pages of exhibits, and FDDA respectfully requests that this Court affirm the decision of the district judge. However, if the Court reverses the district judge's enforcement of the limitation provision in the SRO, FDDA respectfully requests that this Court reverse the finding that CJ II established damages for loss of personal use of the CONSTANCE JOY in the amount of $1,930,945 and hold that damages for loss of personal use of the yacht are not recoverable under the general maritime law and were not sufficiently proven in this case.

Respectfully submitted,

BROWN SIMS, P.C.

*<u>/s/ Kenneth G. Engerrand</u>*
Kenneth G. Engerrand
Lead Attorney
State Bar No. 00619500
BROWN SIMS, P.C.
1990 Post Oak Blvd., Suite 1800
Houston, Texas 77056
kengerrand@brownsims.com
713.629-1580

George M. Chalos
State Bar No. 24077854
CHALOS & CO., P.C.
7210 Tickner Street
Houston, Texas 77055
gmc@chaloslaw.com
713.574-9582

*Attorneys for Defendant-Appellee/ Cross-Appellant, Stewart & Stevenson FDDA, L.L.C. Doing Business As Florida Detroit Diesel-Allison*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, I electronically transmitted this document to the Clerk of the Court of the Fifth Circuit Court of Appeals using the CM/ECF system. The CM/ECF system sent a Notice of Electronic Filing to the attorneys of record who have consented in writing to accept such Notice as service of this document by electronic means.

/s/ Kenneth G. Engerrand
Kenneth G. Engerrand
*Lead Attorney for Defendant-Appellee/ Cross-Appellant*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this Brief contains 12,991 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Georgia font with footnotes in 12-point Georgia font.

Pursuant to Fifth Circuit Rule 32.3, the undersigned understands that a material misrepresentation in this Certificate of Compliance may result in striking the Brief and in sanctions against the person signing the Brief.

*/s/ Kenneth G. Engerrand*
Kenneth G. Engerrand
*Lead Attorney for Appellee/Cross-Appellant*